# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00260-CV

**EMC Mortgage Corporation, Appellant**

**v.**

**Fred E. Davis and Sherry A. Davis, Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT NO. GN2-03159, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING

## O P I N I O N

EMC Mortgage Corporation appeals from the district court's judgment after a jury trial awarding Fred E. Davis and Sherry A. Davis damages and attorney's fees based on EMC's anticipatory repudiation of a loan agreement between the Davises and a previous owner of a promissory note. The Davises entered into an agreement to purchase a home. The promissory note specified that the agreement was subject to a balloon payment but did not specify the amount or due date of the balloon payment. However, the balloon-payment obligation was specified in various disclosure notices signed at the same time as the note. When the Davises sought to refinance their debt and pay off the loan, EMC took the position that the Davises were not entitled to pay off the loan for the amount listed as a balloon payment because the note did not specify the terms of a

balloon-payment obligation and because the balloon payment-obligation described in the various disclosure agreements would have resulted in a windfall for the Davises.

Subsequently, the Davises refinanced their home, paid off their loan with EMC for the amount requested by EMC, and sued EMC for anticipatory repudiation of the loan. The district court denied cross motions for summary judgment. In a letter to counsel explaining the ruling, the judge concluded that the agreement between the parties was ambiguous and the note was internally inconsistent. The jury found that the agreement was subject to a balloon-payment obligation as set forth on the face of the note and described in the disclosure agreements and that EMC repudiated the loan agreement and awarded the Davises $182,954.74 in damages and $91,400 in attorney's fees. We will affirm the decision of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1989, the Davises bought a foreclosed home in Austin, Texas, from ICA Mortgage Corporation for $435,000 of which $390,500 was financed. The Davises applied for and obtained a loan from Imperial Savings for $390,500. The loan was transferred from Imperial Savings to several subsequent holders, and eventually the loan was transferred to EMC on October 1, 2001.

Under the terms of the note, the Davises agreed to pay $390,500 at an interest rate of 10% per year and agreed to make monthly payments of $3,426.92 starting on July 1, 1989. Also, under the terms of the note, the Davises could pay the loan back early without any penalty. The note further states that if the Davises still owed money on June 1, 2019, referred to as the "maturity date," then they would have to pay any outstanding amount owed on that date.

2

At the top of the note, in capital letters centered in the document, is the following language: "THE TERMS OF THIS NOTE CONTAIN PROVISIONS FOR A BALLOON PAYMENT AT MATURITY." The note does not specify the amount or the due date of the balloon payment.

ICA Mortgage Corporation's counterproposal to the original earnest money contract, which was incorporated and made part of the original earnest money contract, states that the finance payments were based on a thirty-year amortization period with all principal and accrued interest due on or before fifteen years after the note was executed. In addition, the residential loan application filled out by the Davises also describes a thirty-year amortization period and a fifteen-year term. Further, Imperial Savings's instructions that were given to the closing agent specified that a balloon-payment disclosure was required for the closing of the loan.

In addition to the note, the Davises signed the following items at the same time the note was executed: (1) a deed of trust; (2) a balloon-payment disclosure, stating that the Davises had received notice of the balloon-payment obligation; and (3) a regulation-Z disclosure, a federally required truth-in-lending disclosure.

Both the balloon-payment disclosure and the regulation-Z disclosure state that the loan requires 179 payments of $3,426.92 and a final payment of $140,296.42, which would be due in June 2004. In addition, the regulation-Z disclosure states that the total amount that will have been paid after all payments were made would be $753,715.10. When the sum of 179 payments of $3426.92 is added to the final payment of $140,296.42, the total is $753,715.10.

3

During the years of the agreement, the Davises had received mortgage statements indicating that they owed a principal amount on the loan that was well over $300,000. Over the years, the note was transferred several times to different lenders. However, prior to EMC acquiring the note, none of the lenders sought to alter the terms of the agreement as understood by the Davises or took the position that the agreement was not subject to a balloon payment of $140,296.42 due in June 2004. Wanting confirmation of the interest rate and the balloon-payment provision of the agreement, the Davises wrote to EMC's predecessor, Bank of America Mortgage. In response to the Davises' request, Bank of America Mortgage sent a letter to the Davises confirming that the interest rate for the loan was 10% and that there was a balloon-payment obligation of $140,296.42 that would be due on June 1, 2004. When EMC became the holder of the note, EMC refused to allow the Davises to pay off the note by making monthly payments until June 2004 and then paying $140,296.42 as a balloon payment. Rather, EMC took the position that in June 2004 the Davises would still owe $318,899.09.

In July 2002, Mr. Davis contacted EMC asking for a final, early payoff amount because the Davises wanted to refinance their home with another lender. EMC informed Mr. Davis that the final payoff amount would be $337,828.85. The Davises paid the balance due based upon the amount specified by EMC and refinanced their loan.

The Davises then sued EMC claiming that EMC had breached the contract, that EMC's conduct constituted statutory fraud, and that refusing to release the lien for the amount listed in the disclosure was an anticipatory repudiation of the loan by EMC. Further, the Davises sought

4

a declaratory judgment stating that the contract required a balloon payment of $140,296.42 that was due in June 2004.

Both parties moved for summary judgment; the Davises claimed that the note was ambiguous, but EMC argued that the note was not ambiguous. The district court denied EMC's motion for summary judgment and granted the Davises' motion in part, finding that the contract was ambiguous. The case proceeded to trial on the Davises' allegation that EMC had repudiated the loan agreement.

At trial, an accountant, Tom Glass, testified that, as a result of paying the amount specified by EMC, the Davises had suffered financial damages in the amount of $182,954.74. In making this calculation, Glass testified that he considered all the monthly payments the Davises had paid over the years, the balloon payment, and how much EMC benefitted in unearned interest by the Davises paying the loan off early. First, Glass claimed that multiplying the monthly payment listed in the note and the disclosures, $3,426.92, by the 179 payments listed in the disclosures and adding the balloon payment listed in both disclosures, $140,296.42, produces a total of $753,715.10, which is the amount listed in the regulation-Z disclosure as the total of all payments. Next, Glass testified that because the Davises paid 159 monthly payments of $3,426.92 and a pay-off amount of $337,371.70 after refinancing (a total of $882,251.48), they overpaid EMC by $128,536.88. Finally, Glass testified that, because the Davises paid off their loan approximately two years early, EMC was overcompensated in the payoff by $54,417.86 in unearned interest. The unearned interest and the overpayment together provide the $182,954.74 damage figure.

On cross-examination, Glass testified that if the $390,500 principal is amortized over thirty years, then the Davises would still owe $333,666.04 as principal even after making 159 payments. Glass also testified that, at the time the note was fully paid off, the Davises had only reduced their principal obligation by about $60,000. In addition, Glass testified that if the total listed in the regulation-Z disclosure, $753,715.10, represented the total amount paid, then that figure would consist of approximately $540,000 in interest to be paid over the fifteen-year period and approximately $200,000 in principal debt reduction—substantially less than the $390,500 principal amount listed in the note.

EMC also elicited testimony from expert witness Charles Granger, a public accountant, who testified that a $390,500 loan that has been amortized over a thirty-year period at a 10% interest rate with monthly payments of $3,426.92 would have a balloon payment of $322,325.79 if paid after fifteen years. Granger explained that the balloon payment would be so large because the monthly payments paid up until the fifteen-year point would consist of mostly payments on the interest that would accumulate over a thirty-year term and because most of the principal reduction in a loan occurs in the last half or the last third of a loan. Finally, Mr. Granger testified that, under the terms of the agreement, if the Davises paid off the loan after 159 payments, the Davises would have an outstanding principal balance of $333,665.82.

Regarding attorney's fees, counsel for the Davises testified that the Davises had agreed to a one-third contingency fee. Further, counsel for the Davises testified that the Davises were also suing EMC for attorney's fees and testified about how each of the eight factors listed by

the supreme court for determining reasonable attorney's fees applied in this case. *See Arthur Anderson & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997).

The jury found in favor of the Davises on their claim of anticipatory repudiation by EMC. The jury found that the loan provided for 179 monthly payments and a balloon payment of $140,296.42 due in June 2004. Based on amounts found by the jury, the district court awarded the Davises $182,954 in damages and $91,400 in attorney's fees.

## DISCUSSION

EMC contends that the district court erred by finding the promissory note was ambiguous, that the *D'Oench, Duhme* doctrine prevents the Davises from asserting language in the disclosures that is contrary to the language in the note as a defense to their obligation under the note, and that the amount of attorney's fees awarded is excessive. We will consider each of these assertions in the order raised.

### Ambiguity

Courts employ the same rules for interpreting a note that they use to interpret a contract. *See Affiliated Capital Corp. v. Commercial Fed. Bank*, 834 S.W.2d 521, 526 (Tex. App.—Austin 1992, no pet.) (court applied rules of contract construction when interpreting note). When construing a written contract, the court's first priority is to determine the intent of the parties as expressed in the instrument. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *National Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex. 1995). When determining the parties' intent in a contractual dispute, courts should consider the entire writing in order to give effect to all provisions of the contract and to prevent any provision from being rendered

7

meaningless. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983); *Affiliated Capital Corp.* 834 S.W.2d at 526. No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument. *Coker*, 650 S.W.2d at 393. If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and the court will construe the contract as a matter of law. *Id.*; *Affiliated Capital Corp.* 834 S.W.2d at 526. A contract, however, is ambiguous when its meaning is uncertain and doubtful or when it is reasonably susceptible to more than one meaning. *Coker*, 650 S.W.2d at 393. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. *Id.* at 394. When a court determines that a contract is ambiguous, a court may admit extraneous evidence to determine the true meaning of the instrument and may consider the parties' interpretations of the contract. *National Union*, 907 S.W.2d at 520. However, a court may not admit parol evidence for the purpose of creating an ambiguity. *Id.*

EMC asserts that, because the note can be given a definite legal meaning and is not reasonably susceptible to more than one meaning, the note is unambiguous as a matter of law. *See Lopez v. Munoz, Hockema & Reed L.L.P.,* 22 S.W.3d 857, 861 (Tex. 2000). Further, EMC contends that the material terms that generally appear in a loan contract—the amount to be loaned, the maturity date of the loan, the interest rate of the loan, and the repayment terms of the loan, *see T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992)—are all present within the four corners of the note, and, therefore, the payment obligation is clear. EMC argues there is no ambiguity in the agreement between the parties because the note does not omit terms, *see*, *e.g.*, *Hoss*

8

*v. Fabacher*, 578 S.W.2d 454, 455-56 (Tex. Civ. App.—Houston [1st Dist.] 1979, no writ) (instrument unenforceable because it did not contain promise to pay amount); does not contain conflicting terms, *see National Union,* 907 S.W.2d at 520 (patent ambiguity is one that is evident on face of contract); and does not contain any confusing terms, *see Netherland v. Wittner*, 662 S.W.2d 786, 788 (Tex. App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.) (note ambiguous because not clear if interest had been figured into principal amount due).

EMC's contention that the contract is unambiguous would require us to conclude that there is only one reasonable interpretation of the agreement between EMC and the Davises—EMC's interpretation. However, the note itself is open to more than one reasonable interpretation. *See Coker*, 650 S.W.2d at 393 (contract ambiguous if susceptible to more than one reasonable interpretation).[1] The note specifies that the maturity date for the loan was thirty years from the time the loan was issued. Further, the note specifies that the Davises agreed to make monthly payments of $3,426.92 every month until the loan is paid off. However, in capital letters at the top of the note, the note also states that the terms of the agreement include provisions for a balloon payment. An agreement that has a balloon-payment requirement generally calls for regular, equal payments consisting of minor amounts of principal and interest and a large final payment at the end of the loan that fully satisfies the monetary obligations under the loan. *See, e.g., Parker v. Dodge*, 98 S.W.3d 297, 299 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (agreement called for monthly payments of $1,000 with balloon payment of $120,000 after ten years of monthly payments); *Katy Pers.*

---

[1] In the charge to the jury, the jury was asked whether the Davises and Imperial Savings Association, the original holder of the note, entered into an agreement that required a final balloon payment of $140,296.42 due in June 2004, and the jury responded in the affirmative.

*Storage v. First State Bank,* 968 S.W.2d 579, 580 (Tex. App.—Houston [14th Dist.] 1998, pet. withdrawn) (agreement called for balloon payment in which all remaining principal and interest remaining after previous payments would be paid).[2]

Because the note states that there is a balloon-payment obligation but does not specify the terms and the payment terms in the note do not include a balloon payment, the note is ambiguous about whether a balloon payment is required.[3] An agreement cannot both require a balloon-payment requirement and require equal monthly payments of principal and interest.[4] *See National Union*, 907 S.W.2d at 520 (patent ambiguity is one present on face of contract).

Because the note is ambiguous, extrinsic evidence may be considered to determine the intention of the parties. *Id*. Both the original counterproposal to the earnest money contract and the residential loan applications filled out by the Davises describe the loan as containing a thirty-year amortization period and a fifteen-year term. The counterproposal further specifies that all principal and accrued interest are due at the end of the fifteen year term. Further, the instructions used by the

---

[2] Contrary to EMC's suggestion, a balloon payment is not the final monthly payment of a loan that had equal monthly payments. *See Hughes v. Lee*, No. 05-95-01745-CV, 1997 Tex. App. Lexis 5169, at * 1, n.1 (Dallas October 1, 1997) (not designated for publication), *dism'd* by 2001 Tex. App. Lexis 3804 (dismissal based on agreement of parties) (balloon payment is final payment of principal under promissory note that commonly calls for regular, minimum payments of principal and requires substantial payment of principal at end of term; final payment is often essentially all principal due under agreement).

[3] Contrary to EMC's assertions, the parties' interpretations of the loan agreement were not used to create an ambiguity. Rather, the note, on its face, was ambiguous about whether a balloon payment was required. The parties' interpretations were considered in resolving the ambiguity.

[4] Determining whether a balloon payment is required does not, as the dissent suggests, give less weight to other terms in the agreement. Rather, determining whether a balloon payment is required is an attempt to determine the intentions of the parties regarding one of the material terms of the loan agreement: the repayment terms.

closing agent state that a balloon-payment disclosure must be given to the Davises in order for the

loan to be closed.  Both the balloon-payment disclosure and the federally required regulation-Z

disclosure specify that monthly payments of $3,426.92 were to be paid by the Davises for fifteen

years and a final or balloon payment of $140,296.92 must be paid by the Davises in June 2004.

These documents both support the Davises' interpretation of the loan agreement that a balloon

payment was required and specify precisely what the Davises' repayment obligations were.  Further,

the Davises' interpretation of the repayment terms was confirmed by EMC's predecessor in interest.[5]

---

[5] EMC also asserts that the language at the top of the note specifying a balloon payment is a mere recital.  We disagree.  The language at the top of the note is not a recital.  A recital is a formal statement in any deed or writing that is used to explain the reasons upon which the transaction is based. *McMahan v. Greenwood*, 108 S.W.3d 467, 484 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).  The balloon-payment provision at the top of the note does not specify or explain the reasons for this transaction.  Instead, the balloon-payment provision notifies the parties that the transaction between them is subject to a balloon-payment obligation, which directly affects a material term of the loan agreement: the repayment term.

Similarly, EMC also asserts that, as a holder in due course, courts may not look to documents other than the note—a negotiable instrument—to determine the terms of the agreement because the rule that instruments executed with a negotiable instrument by the original parties are to be treated as one does not apply to a holder in due course.  Further, EMC contends that the disclosure agreements do not qualify as part of the negotiable instrument because they do not contain an unconditional promise to pay and should not be construed as part of the loan agreement.  However, we need not address these arguments because we are not construing all of the documents executed with the note as one agreement.  Rather, we are relying on extrinsic evidence to determine the intention of the parties, which was ambiguously described in the note.  Further, a holder-in-due-course status only protects the holder against claims that are not apparent from the face of the instrument or claims of which the holder does not have notice.  Tex. Bus. & Com. Code Ann. § 3.302 (West 2002); *see generally Texas State Bank of Austin v. Sharp*, 506 S.W.2d 761, 763-64 (Tex. Civ. App.—Austin 1974, writ ref'd n.r.e.) (written agreement and note executed as part of same transaction and subsequent takers not innocent purchasers without notice).  EMC was aware of the balloon-payment obligation at the top of the note in capital letters, had possession of the disclosure notices, and, therefore, had notice of the balloon-payment provision.  Additionally, truth-in-lending disclosures have been considered part of a loan agreement. *See Briercroft Serv. Corp. v. De Los Santos*, 776 S.W.2d 198, 204 (Tex. App.—San Antonio 1989, writ denied).

11

EMC also contends that allowing the Davises to pay the balloon payment as satisfaction of the loan reduces the amount of principal the Davises were required to pay. This can only be true under EMC's interpretation of the contract under which the parties did not agree to a balloon payment due fifteen years after execution of the note to satisfy the terms of the note. However, the original parties to the loan agreed that the balloon payment in question would satisfy the requirements of the loan, as the signed note requiring a balloon payment and the signed documents defining the balloon payment-obligation show.

Because the note states that there is a balloon-payment obligation but does not specify the terms and because the payment terms present on the note do not include a balloon payment, the note is ambiguous, and the district court correctly considered extrinsic evidence, including the disclosures, in order to ascertain the agreement between the two parties. We therefore overrule EMC's first issue on appeal.[6]

### D'Oench, Duhme Doctrine

In its second issue on appeal, EMC argues that, to the extent the disclosure notices might be interpreted as separate agreements, the D'Oench, Duhme doctrine prevents the Davises from asserting language in a disclosure notice that is contrary to the language in a note as a defense

---

[6] Because we conclude that the note was ambiguous and that the court properly looked to extrinsic evidence to ascertain the intention of the parties, we need not address EMC's assertion that truth-in-lending disclosures serve only an educational function and do not become part of the loan agreement. Even if we were to adopt EMC's assertion, the disclosures, counterproposal, residential loan application, and closing agent's instructions could be used as extrinsic evidence to supply meaning to an ambiguous loan agreement. *National Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex. 1995).

to paying under the terms of the note. The *D'Oench, Duhme* doctrine is a rule of estoppel that precludes a borrower from asserting defenses against the Federal Deposit Insurance Corporation and its assignees that are based on either secret or unrecorded agreements that alter the terms of an obligation. *Bell & Murphy & Assocs. v. Interfirst Bank Gateway*, 894 F.2d 750, 753-54 (5th Cir. 1990); *see also D'Oench, Duhme & Co., Inc. v. Federal Deposit Ins. Corp.,* 315 U.S. 447 (1942). The purpose behind the *D'Oench, Duhme* doctrine and its statutory counterpart is to allow federal and state bank examiners to rely on a failed bank's records in evaluating the bank's assets and to prevent fraudulent insertion of new terms into agreements. *Federal Deposit Ins. Corp. v. McFarland*, 33 F.3d 532, 536 (5th Cir. 1994); *see* 12 U.S.C.A. § 1823(e)(1) (West 2001). EMC contends that, as a successor assignee to the agreement in question, it is protected by the *D'Oench, Duhme* doctrine from the Davises' personal defenses to obligations from the note and from claims and defenses based upon collateral agreements that were not firmly established in the official records. *See Resolution Trust Corp. v. Oaks Apartments Joint Venture*, 966 F.2d 995, 999-1000 (5th Cir. 1992) (case remanded to determine whether requirements of *D'Oench, Duhme* met and whether guaranty was secret side agreement).

The *D'Oench, Duhme* doctrine has been partially codified; to enforce an agreement against the interests of a corporation, the agreement must satisfy the following requirements:

(1) **In general**

> No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement–

13

(A)  is in writing,

(B)  was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(C)  was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(D)  has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C.A. § 1823(e) (West 2001).

EMC asserts that the disclosure notices do not satisfy the statutory requirements of section 1823(e)(1). Specifically, EMC urges that the requirements of section 1823(e)(1) are not satisfied because there is no contention or evidence that the disclosure notices were approved by the Imperial Savings board and because there is no evidence that the disclosure notices were an official record of the "depository institution" continuously from the time of their execution.

Neither the *D'Oench, Duhme* doctrine nor section 1823(e)(1) applies in this case. In this case, the disclosure agreements, along with other documents, were used to determine the intention of the parties because the note was ambiguous. The language in the disclosure agreements was not used as a defense to paying under the terms of the note; on the contrary, the disclosure agreements were used to clarify an ambiguity rather than contradict the note.[7] The Davises'

---

[7] Because we have held that the disclosure agreements were used to clarify the intention of the parties under the ambiguous note, we need not address EMC's assertion that *D'Oench, Duhme* doctrine would prohibit use of the disclosure agreements as separate agreements contradicting the terms of the note. However, even considering EMC's assertions, the *D'Oench, Duhme* doctrine would not prohibit the consideration of the disclosure agreements. The *D'Oench, Duhme* doctrine

14

interpretation of the agreement is not based on an unrecorded or a secret agreement. Rather their interpretation is based on written documents that were executed at the same time as the ambiguous promissory note and that explain the balloon-payment provision referenced in the note.

More importantly, the *D'Oench, Duhme* doctrine only bars claims or defenses that would not have put an individual on notice when reviewing the records on file with a bank. *Federal Deposit Ins. Corp. v. Waggoner*, 999 F.2d 826, 828 (5th Cir. 1993) (citing *Resolution Trust Corp. v. Sharif-Munir-Davidson Dev. Corp.*, 992 F.2d 1398, 1404 (5th Cir. 1993)) (defense in previous notes not barred by *D'Oench, Duhme* because previous notes were in bank's possession and previous notes were referenced in current note); *see Federal Deposit Ins. Corp. v. Laguarta*, 939 F.2d 1231, 1238-39 (5th Cir. 1991) (presence of defense in loan agreement and other loan documents not subject to protection of *D'Oench, Duhme* doctrine). The two disclosures were in EMC's files and were in existence prior to EMC purchasing the note from the previous holder. Unlike in *Oaks Apartments*, in this case, both the parties agree that the disclosure agreements were in EMC's possession. *See* 966 F.2d at 999-1000 (case remanded to determine whether *D'Oench, Duhme* applied and outcome would be partially dependent upon whether guaranty, executed at same time as note, was in same loan file as note, which would put savings and loan on notice). Therefore, EMC had knowledge of

---

requires full disclosure between lenders and borrowers, but it does not require the agreement be confined to the face of any one lending document, such as a note. *Resolution Trust Corp. v. Oaks Apartments Joint Venture*, 966 F.2d 995, 999 (5th Cir. 1992). The fact that an agreement between a lender and a borrower is manifested in more than one document does not automatically imply a deceptive secret agreement. *Id.* The *D'Oench, Duhme* doctrine does not prohibit one from raising a claim or defense based on a written agreement that is integral to the loan transaction. *Id.*

the balloon-payment requirement from the face of the note and all the documents accompanying the loan.

Like the *D'Oench, Duhme* doctrine, section 1823 is not implicated because there is no question of collusion, fraud, or bad faith, and there are no undisclosed or secret agreements. *McFarland*, 33 F.3d at 536. The disclosure notices were not kept secret or undisclosed. Also, the disclosure notices did not tend "to diminish or defeat the interest . . . in any asset acquired" by a corporation because the disclosure notices provide meaning to the ambiguous asset acquired by EMC. *See* 12 U.S.C.A. § 1823(e)(1).

Because the *D'Oench, Duhme* doctrine and section 1823(e) do not apply in this case and do not prevent the Court from considering the documents executed at the same time as the note, we overrule EMC's second issue on appeal.

**Attorney's fees**

In EMC's final point of error, EMC contends that there is insufficient evidence to support the award of attorney's fees in this case. Generally, the reasonableness of an attorney's fees award is a question of fact for the trier of fact. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). We review the decision by a district court to either grant or deny attorney's fees under an abuse of discretion standard, and we review the amount awarded as attorney's fees under a legal sufficiency standard. *Allison v. Fire Ins. Exch.*, 98 S.W.3d 227, 262 (Tex. App.—Austin 2002, pet. granted, judgm't vacated w.r.m. by agr.). A district court abuses its discretion if it acts without reference to any guiding principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex.

16

1985).  In determining whether a district court abused its discretion, we must determine whether the district court's action was arbitrary or unreasonable.  *Id.* at 242.  Because we review the amount of attorney's fees awarded under a legal sufficiency review, we must view the evidence in a light that tends to support the disputed finding and disregard evidence and inferences to the contrary.  *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003).  If more than a scintilla of evidence supports the challenged finding, the legal sufficiency challenge must fail.  *Id.*

The supreme court has listed various factors that a fact finder should consider when determining what a reasonable award of attorney's fees should be.  *Arthur Anderson*, 945 S.W.2d at 818.[8]  Counsel for the Davises testified about how each factor applied in this case.  First, counsel

---

[8]  The factors listed in *Arthur Anderson* include the following:

(1)  the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2)  the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer;

(3)  the fee customarily charged in the locality for similar legal services;

(4)  the amount involved and the results obtained;

(5)  the time limitations imposed by the client or the circumstances;

(6)  the nature and length of the professional relationship with the client;

(7)  the experience, reputation and ability of the lawyer or lawyers performing the services; and

(8)  whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered

17

testified that they had spent a little over 127 hours on the case in question and would generally charge $200 per hour in a similar non-contingent case, which counsel testified was a reasonable attorney's fee. Multiplying these figures together totals approximately $25,000. Second, counsel testified that he had tried very hard to resolve this case quickly and that a one-third contingency fee based on the limited one-time relationship counsel has with the Davises was reasonable. Third, counsel testified that he has a good reputation in the community as a lawyer and has over a decade of legal experience. Fourth, counsel testified that because there is a contingency fee agreement and because the client will be required to pay the attorneys whatever amount is not awarded as attorney's fees, then the jury could appropriately use a multiplier to increase the amount of money above what the total amount for attorney's fees would have been had counsel charged an hourly rate. Further, counsel requested that the jury use a multiplier that was somewhere between two and four if they decided to award attorney's fees. Counsel testified that, based on the amount in controversy and based on the eight factors under *Arthur Anderson*, reasonable attorney's fees for this case would be between $25,399.99 and $90,000.00.

EMC urges that, because the theory of recovery and the evidence were limited to loan documents, the parties engaged in only one pre-trial hearing, and the trial lasted only three days, the workload in this case was not especially complex and did not warrant such a large award of attorney's fees. *Cf. Wal-Mart Stores, Inc. v. Itz*, 21 S.W.3d 456, 484 (Tex. App.—Austin 2000, pet. denied) (affirming $122,058.75 attorney's fees award when total damages awarded was $232,330.18

---

*Arthur Anderson & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997).

18

in complex two week trial). Further, EMC argues that a contingency fee agreement alone cannot support an award of attorney's fees. *See Arthur Anderson*, 945 S.W.2d at 818.[9]

However, while there are cases suggesting that a contingency fee agreement alone cannot support an award of attorney's fees, an award of attorney's fees based on an attorney's testimony regarding the eight factors listed in *Arthur Anderson*, including whether there is a contingency agreement, has been upheld. *See Vingcard A.S. v. Merrimac Hospitality Sys., Inc.*, 59 S.W.3d 847, 870 (Tex. App.—Fort Worth 2001, pet. denied). In addition, proof of the difficulty of a particular case is not the only factor to consider when deciding whether attorney's fees are reasonable. *See Arthur Anderson*, 945 S.W.2d at 818. In this case, counsel testified that a lawyer with his level of experience would have charged $25,000 in legal fees if paid by the hour and testified that, because there was a contingency fee agreement, a multiplier of between two and four would be appropriate to apply in this case. The award of $91,400 was within the range of possible awards if a multiplier was used to calculate attorney's fees and was just over the $90,000 figure counsel for the Davises testified was reasonable in this case. The evidence and record met the

---

[9] EMC also cites to federal cases as support for its assertion that the attorney's fees awarded in this case were excessive, but these cases provide no support for the proposition that a jury is prohibited from increasing the amount of attorney's fees based on factors prescribed by the Texas Supreme Court, including the presence of a contingency fee agreement. *See Pennsylvania v. Delaware Valley Citizens' Counsel for Clean Air*, 483 U.S. 711, 730 (1987) (Supreme Court reversed increasing attorney's fees beyond lodestar figure because enhancing beyond one third of reasonable lodestar fee generally not permissible under fee-shifting statutes); *City of Burlington v. Dague*, 505 U.S. 557, 567 (1992) (increasing attorney's fees award beyond lodestar amount based on contingency fee agreement not permitted under fee-shifting portions of Solid Waste Disposal Act and Clean Water Act).

requirements of *Arthur Anderson* and provided the jury with sufficient evidence to make a determination of reasonable attorney's fees. *Vingcard*, 59 S.W.3d at 870.

Because there is evidence of some of the eight *Arthur Anderson* factors supporting the reasonableness of the award of attorney's fees, we find that the district court did not abuse its discretion when awarding the Davises $91,400 in attorney's fees. We, therefore, overrule EMC's third issue on appeal.

## CONCLUSION

We hold that the district court did not err by finding the promissory note ambiguous; that the *D'Oench, Duhme* doctrine does not bar consideration of the loan documents executed at the same time as the note to supply meaning to an ambiguous note; and that the award of attorneys fees was not excessive. Therefore, we affirm the judgment of the district court.

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear: Opinion by Chief Justice Law; Dissenting Opinion by Justice Puryear

Affirmed

Filed: May 12, 2005