# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00700-CV

**Joyce Ludwig, Appellant**

**v.**

**Encore Medical, L.P. f/k/a Encore Orthopedics, Inc.; Encore Medical GP, Inc.; and Encore Medical Corporation, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT NO. GN201588, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING**

---

## O P I N I O N

Appellee Encore Medical L.P.[1] adopted a severance agreement to protect its key executives should a third party take control of the company. Two conditions triggered benefits under the agreement: a change of control and a termination event, defined to include an executive's resigning for "good reason." Joyce Ludwig sued for severance benefits, alleging that control of the company had changed and that she had terminated her own employment for good reason. Encore denied both allegations. The jury found that control of the company had changed but that Ludwig had not terminated her employment for good reason. Consequently, no benefits were provided to Ludwig by the severance agreement. After the jury's verdict, Ludwig presented her claim for

---

[1] It appears from the record that appellee Encore Medical L.P. was formerly known as Encore Orthopedics, Inc., Encore Medical GP, and Encore Medical Corporation. For ease of reference we will refer to appellee as "Encore."

attorney's fees to the court, asserting that under the severance agreement, Encore was obligated to pay litigation expenses even to a non-prevailing party. The district court denied her request for attorney's fees and entered a take-nothing judgment on the jury verdict. Ludwig does not appeal the take-nothing judgment but complains only of the court's failure to grant her attorney's fees. We hold that the district court did not err in denying attorney's fees to Ludwig under these circumstances.

**BACKGROUND**

Encore designs, manufactures, and markets orthopedic devices for medical purposes. Encore was formed in 1992 by seven individuals who all had prior experience with orthopedic implants. Joyce Ludwig and her husband Ken were two of Encore's founding employees. Ken was vice president of sales and marketing, Joyce managed quality assurance.

In 1995, president Nicolas Cindrich decided to reward Encore's founding employees with severance agreements. Ludwig received a severance agreement because she was one of the original employees. Cindrich testified that the purpose of these agreements was to protect the founders "in the event that we [Encore] were acquired and the people that bought the company wanted to either replace or displace" an executive. Harry Zimmerman, Encore's general counsel, drafted the agreements; he testified that the severance agreements were designed "to protect the employees in case the company was sold, somebody came in and bought the company, took it over, and then either fired them or tried to run them away." The severance agreement imposed mutual covenants of non-competition, confidentiality and non-disparagement on the protected executives.

In 1997, Encore became a public company; its stock was traded on the NASDAQ exchange. In 2000, a group known as Galen Entities made a substantial capital investment in Encore

2

in exchange for Series A Preferred Stock. Amon Burton, a professor at the University of Texas School of Law, testified that in his expert opinion "a change of control had occurred at Encore when they closed the transaction to sell those shares to the Galen Entities." Professor Burton's opinion was based on his analysis of the rights Galen Entities received as owners of the preferred shares. One condition of Galen Entities' investment was that all key executives, except Joyce Ludwig, surrender their severance agreements.[2]

In January 2001, Encore terminated Ludwig's husband, Ken. After failing to find a job locally, Ken began a nationwide search. In November 2001, he accepted a job in Bethlehem, Pennsylvania and moved there the following month. On December 1, 2001, Joyce Ludwig informed her supervisor, J.D. Webb, that she was resigning to follow her husband to Pennsylvania. She asked if she could continue working until her house sold; this arrangement seemed mutually beneficial and was agreed to by Encore. Ludwig testified that she gave Webb notice of her relocation out of professional courtesy. She also indicated that she was willing to assist Webb in finding and training her replacement. Webb informed his supervisor, Craig Smith, and Encore's human resources department of Ludwig's announced departure. Webb began advertising for Ludwig's replacement in January 2002 and Ludwig helped interview the applicants.

Three months later, after consulting with a local employment attorney, Ludwig delivered a letter to Webb on March 1, 2002, stating that as a "single mom" she was terminating her employment "effective immediately" because of increased travel requirements:

---

[2] The key executives received stock in exchange for their rights under the severance agreements. The record does not explain why Joyce Ludwig did not receive stock to surrender her agreement, but does reflect that she was a mid-level manager and not a key executive.

3

I have decided to terminate my employment with Encore for 'Good Reason' as that term is defined in my Severance Agreement. Specifically, despite my repeated objections, the Company has significantly increased the travel requirements of my position by requiring that I spend more than twice the number of nights away from home during the present 6 month period (9/2001 through 2/2002) than were necessary during the previous six month period, or any six month period since I began working at Encore in 1992. Accordingly, I have experienced a 'Termination Event' under Section 2(a) of my Severance Agreement and am therefore entitled to the severance benefits set forth in Section 2(b) of the Severance Agreement. I expect the Company to honor its obligations under the Severance Agreement.

Harry Zimmerman responded the same day that Encore believed that it was not obligated to honor her severance agreement demands because she had previously tendered her resignation for personal reasons on December 1, 2001. Ludwig responded that she did not "actually" resign in December 2001 but merely informed Webb that she "would eventually resign to join my husband in Pennsylvania." She also asserted that her March 2002 resignation, which occurred prior to the sale of her house, was "premature and directly attributable to the strain of the increase in travel that has been required over the past 6 months." Ultimately, Encore determined that Ludwig was not entitled to benefits provided by the severance agreement because she had previously terminated her employment for personal reasons rather than for "good reason" under the agreement.

In May 2002, Ludwig sued Encore. Ludwig claimed that Encore had breached her severance agreement. She also insisted that her severance agreement required Encore to pay all of her legal fees, whether or not she prevailed. Ludwig authorized her attorneys to bill Encore for any fees or expenses incurred as a result of her litigation. In addition, Ludwig filed an application for a temporary injunction asking the district court to enjoin Encore from continuing to refuse to pay her ongoing litigation expenses. Encore maintained that it was not obligated to pay Ludwig's litigation

expenses because she was not entitled to any benefits or rights provided by the severance agreement. The district court denied Ludwig's application for interim attorney's fees.

Ludwig's suit was tried in March 2005. The parties agreed that the severance agreement did not provide any benefits unless (1) there was a change in control of Encore, and (2) a "termination event" occurred. The only termination event claimed was that Ludwig terminated her employment with Encore for "good reason," as that term is defined in the agreement.[3] Encore insisted that neither condition had occurred. Encore admitted that a significant increase in Ludwig's travel requirements could constitute good reason for leaving, but disputed that increased travel was the actual reason for Ludwig's resignation, which had already been tendered December 1 for personal reasons. Encore insisted that Ludwig's real reason for leaving the company was her desire to move to Pennsylvania to be with her husband, as she stated to her supervisor three months before she decided to claim benefits under the severance agreement on March 1, 2002. Encore noted that Ludwig did not complain about the travel requirements until January and February 2002; however, when she did complain the trips were either canceled or postponed.[4] Ultimately, the jury found that

---

[3] Section 1(e) of Ludwig's severance agreement provides five instances that would qualify as a "good reason." Section 1(e)(iv), the only situation relevant to this appeal, states

> [A]ny significant increase in the travel requirements of the Executive's position; for the purposes of this clause (iv) a 'significant' increase would include any circumstances under which the Executive is or will be required, during any six-month period to spend more than twice the number of nights away from home as were necessary during the previous six-month period.

[4] Encore disputed that Ludwig's travel was "required." Our review of the record indicates that during the six-month period from September 1, 2001 to February 28, 2002, Ludwig spent a total of four nights away from home. Ludwig was not required to spend one night away from home during the previous six-month period.

Encore did undergo a change in control but that Ludwig did not terminate her employment for good reason.

After the jury was excused, the district court held a hearing on Ludwig's motion for an instructed verdict on attorney's fees and litigation expenses. Both parties stipulated that this issue would be tried to the court and that the court could consider all evidence presented during the trial to the jury. Ludwig insisted that Encore was contractually obligated to pay her litigation expenses, even though she did not prevail. Encore contended that Ludwig was not entitled to any benefits provided by the severance agreement, including litigation expenses, because she had previously resigned for personal reasons. The district court denied attorney's fees and rendered a take-nothing judgment based on the jury's verdict.

Ludwig requested findings of fact and conclusions of law pertaining to the denial of attorney's fees. The district court issued one finding of fact that Ludwig "did not seek to obtain or enforce any right or benefit provided by the Severance Agreement." The district court issued four conclusions of law in support of its denial of attorney's fees: (1) Ludwig was not entitled to any attorney's fees or expenses incurred in the prosecution of her claims against Encore; (2) Ludwig was not entitled to have the court make a finding on the reasonableness and necessity of her attorney's fees; (3) the litigation expenses provision is ambiguous; and (4) to the extent that it could be construed to allow for payment of Ludwig's attorney's fees if she lost at trial, the litigation expenses provision is void as against public policy. In this appeal, Ludwig does not complain of the jury's failure to find that she terminated her employment for good reason. Her sole complaint is that she

6

was entitled to litigation expenses under the severance agreement as the non-prevailing party and that this construction of the agreement is not against public policy.

## DISCUSSION

Ludwig claims that the district court erred in refusing to award attorney's fees and expenses because (1) she did not have to prevail on the merits of her claims to recover reasonable attorney's fees and expenses, (2) the evidence in the record conclusively demonstrates that she did seek to obtain or enforce a right or benefit provided by her severance agreement, and (3) the contractual fee-shifting provision at issue in this case does not violate public policy as the district court concluded. Ludwig insists that her third point makes this a case of first impression: whether parties may contractually decide to provide attorney's fees to a non-prevailing party. We need not reach the public policy question, because construing the litigation expenses provision in light of the whole severance agreement, we hold it does not obligate Encore to pay Ludwig attorney's fees under the circumstances of this dispute.

### Severance agreement

When construing a written contract, our first priority is to determine the intent of the parties as expressed in the instrument. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *National Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995); *EMC Mortg. Corp. v. Davis*, 167 S.W.3d 406, 413 (Tex. App.—Austin 2005, pet. filed). We consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement. *Frost Nat'l Bank v. L&F Distribs.*,

165 S.W.3d 310, 311-12 (Tex. 2005); *Webster*, 128 S.W.3d at 229. If the contract is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and the court will construe it as a matter of law. *Frost Nat'l Bank*, 165 S.W.3d at 312; *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *EMC Mortg.*, 167 S.W.3d at 313. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. *Coker*, 650 S.W.2d at 394; *Wagner v. Compass Bank*, 170 S.W.3d 220, 222 (Tex. App.—Dallas 2005, no pet.); *EMC Mortg.*, 167 S.W.3d at 313.

An ambiguity in a contract may be "patent" or "latent." *See Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 282 (Tex. 1996); *Centerpoint Energy Houston Elec., L.L.P. v. Old TJC Co.*, 177 S.W.3d 425, 431 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). A patent ambiguity is evident on the face of the contract. *Friendswood Dev. Co.*, 926 S.W.2d at 282; *Centerpoint Energy*, 177 S.W.3d at 431. A latent ambiguity arises when a contract that is unambiguous on its face is applied to the relevant subject matter and an ambiguity appears by reason of some collateral matter. *Friendswood Dev. Co.*, 926 S.W.2d at 282-83; *Centerpoint Energy*, 177 S.W.3d at 431. If a latent ambiguity arises from this application, parol evidence is admissible for the purpose of ascertaining the true intention of the parties as expressed in the agreement. *CBI Indus., Inc.*, 907 S.W.2d at 520; *Centerpoint Energy*, 177 S.W.3d at 431. When a latent ambiguity arises, the focus shifts to the facts and circumstances under which the agreement was made. *Centerpoint Energy*, 177 S.W.3d at 431. A latent ambiguity exists when the contract appears to

convey a sensible meaning on its face, but it cannot be carried out without further clarification. *See*

*CBI Indus.*, 907 S.W.2d at 520.

The litigation expenses provision in section five of the severance agreement states:

> The Company shall pay reasonable legal fees and expenses incurred by the Executive as a result of her seeking to obtain or enforce any right or benefit provided by this Agreement, promptly and from time to time, at her request as such fees and expenses are incurred.

This provision does not specifically restrict the right to receive fees and expenses to a prevailing party. Nor does not it explicitly obligate the company to pay fees to a non-prevailing party. In fact, it is silent as to whether a party must prevail to claim litigation expenses. Ludwig insists that the provision implicitly covers a non-prevailing party because it obligates the company to pay fees incurred while "*seeking to obtain* or enforce" a right or benefit provided by the severance agreement. She also notes that fees must be paid "from time to time, at her request as such fees and expenses are incurred," presumably before the prevailing party has been determined. We agree that these words plainly and unambiguously authorize interim attorney's fees if the executive is seeking to obtain any right or benefit provided by the agreement. We further agree that *seeking* a right or benefit is different than actually enforcing or obtaining the benefit. Therefore, we conclude that the litigation expenses provision is unambiguous on its face; an executive seeking to obtain or enforce a right or benefit provided by the agreement is entitled to attorney's fees under the provision whether or not they prevail at trial.

However, the provision is silent as to whether an executive is entitled to attorney's fees when she sues to obtain a benefit under circumstances in which the agreement clearly provides

9

no benefits. Here, Ludwig maintains that the litigation expenses provision obligates Encore to pay her attorney's fees any time she seeks benefits, whether or not that circumstance was contemplated by the agreement. The agreement protects against termination for a period of three years. Could an executive terminated for good reason three years and one week after a change of control sue for benefits and claim that she is entitled to her litigation expenses under the literal reading of the litigation expenses provision? Does the agreement require the court to award litigation expenses for such a suit? Even Ludwig agrees that it does not. Such a claim comes too late and is not contemplated by the agreement: no benefits are "provided" for such a claim.[5] Could the district court similarly determine that this severance agreement provides no benefits to an employee who has previously resigned for personal reasons? Would it be too late to assert a claim under this agreement? We hold that the district court could conclude that the plain language "seeking to obtain or enforce any right or benefit" has some limits and therefore did not err in holding the litigation expenses provision latently ambiguous under these narrow circumstances or by considering parol evidence. *Friendswood Dev. Co.*, 926 S.W.2d at 282-83; *CBI Indus.*, 907 S.W.2d at 520; *Centerpoint Energy*, 177 S.W.3d at 431.

The severance agreement was designed to benefit both Encore and the executive. It plainly provides "the Company wishes to be assured that it will have the continued dedication of the Executive and the availability of her advice and counsel despite the possibility, threat or occurrence of a bid to take over control of the Company." Additionally, "the Company wishes to induce the

---

[5] At oral argument, Ludwig conceded that Encore would not be required to pay litigation expenses for such a claim; likewise, her brief acknowledges that the severance agreement may not obligate Encore to pay attorney's fees for a clearly unmeritorious claim.

Executive to remain in the employment of the Company under such circumstances." It further states that in the event of a possible change in control, "[T]he Company should be able to rely upon the Executive to continue in her position . . . without concern that the Executive might be distracted by any personal uncertainties and risks created by such a proposal." To achieve these goals the agreement sets forth mutual promises and covenants. Encore promised to pay severance benefits to the executive if there was a change in control and a termination event occurred. If the company is obligated to pay severance benefits to an executive, she must comply with several covenants beneficial to Encore.[6]

The plain language of the agreement makes it clear that there are no rights and benefits provided under the severance agreement unless a "termination event" occurs. The only termination event alleged was that Ludwig resigned for good reason. Encore defended this suit by maintaining that Ludwig had already resigned for personal reasons before she attempted to resign for good reason. If Ludwig had already resigned, she was not entitled to any benefits under the severance agreement. The jury agreed, finding that she did not resign for good reason. This construction does not ignore the word "seeking" or the words "from time to time." An executive may have to sue to enforce her benefits due to a dispute pertaining to the amount or timely payment of benefits, or due to an allegation that she breached her covenants of non-competition or non-

---

[6] Under the agreement, an executive who is entitled to severance benefits must also agree to (1) not voluntarily leave the company within three months after a change in control; (2) not compete with the company; (3) refrain from make any disparaging comments about the company or any of its affiliates; and (4) refrain from writing or publishing any books, articles, or other materials that would adversely affect the interests of the company.

disparagement. Under such circumstances the litigation expenses provision as written would apply, whether or not the executive ultimately prevailed.

Ludwig relies on *Creel v. Houston Industries, Inc.*, 124 S.W.3d 742 (Tex. App.—Houston [1st Dist.] 2003, no pet.), to support her claim for attorney's fees. In *Creel*, three executives with severance agreements providing for payment of litigation expenses sued their former employer, challenging the employer's method of calculating their benefits. The attorney's fees provision at issue in *Creel* stated

> It is the intent of the Company that the Executive not be required to incur legal fees and the related expenses associated with the interpretation, enforcement or defense of Executive's rights under this Agreement by litigation or otherwise. . . . [T]he Company irrevocably authorizes the Executive from time to time to retain counsel of Executive's choice, at the expense of the Company . . . to advise and represent the Executive in connection with any such interpretation, enforcement or defense, including without limitation the initiation or defense of any litigation. . . . Without respect to whether the Executive prevails, in whole or in part, in connection with any of the foregoing , the Company will pay and be solely financially responsible for any and all attorneys' and related fees and expenses.

*Creel*, 124 S.W.3d at 745-46. Ultimately, the trial court affirmed the employer's method of calculating severance benefits under the contract, but awarded attorney's fees to the non-prevailing plaintiffs. *Id*. at 748. On appeal, the employer argued that the purpose of the attorney's fees provision was not to subsidize frivolous or unmeritorious claims and that any obligation to pay attorney's fees must be determined with reference to the benefits provided or intended to be provided under the agreement and that no attorney's fees were due to the non-prevailing executives. *Id*. at 754. Our sister court disagreed, holding that the attorney's fees provision's *explicitly* "gave the plaintiffs discretion to commence this litigation and seek payment of their attorneys' fees . . . without

12

limit or qualification." *Id*. The *Creel* agreement permitted the executive to retain counsel in connection with any interpretation, enforcement or defense, including without limitation the initiation or defense of *any* litigation. *Id*. at 745-46. The company was explicitly required to pay counsel of the executive's choice "without respect to whether the Executive prevails, in whole or in part," for "any and all attorneys' and related fees and expenses." *Id*. In *Creel*, the company's obligation was not even limited to "reasonable" attorney's fees; arguably this expansive provision was intended to cover the expense of any counsel the executive chose to advise or represent her. *Id*. The company's unlimited obligation is expressed in its intent that the executive incur *no* legal expense for "litigation or otherwise." *Id*. at 745.

By contrast, Encore's obligation to Ludwig under this litigation expenses provision is more ambiguous. It does not specifically provide litigation expenses to the non-prevailing party. Nor does it grant the executive such wide-ranging choice of when to employ counsel; she must be seeking benefits actually provided by the agreement. This provision does not express the company's intent to relieve the executive of "any and all" legal fees. Moreover, the *Creel* executives would have been entitled to attorney's fees even under the district court's construction of the Encore agreement: the *Creel* executives were undeniably entitled to benefits provided by their agreements and only disputed the calculation of those benefits.

We reject Ludwig's reading that under this latently ambiguous provision Encore must reimburse legal expenses to every executive who seeks benefits under the severance agreement, even under circumstances where the agreement provides no benefits. Nicolas Cindrich, Encore's president at the time the severance agreement was drafted, testified that the agreement was not

13

designed to be a bonus or to protect an employee who left the company for personal reasons. Likewise, Harry Zimmerman, Encore's corporate counsel who drafted the agreement, testified that an executive would not be entitled to attorney's fees under the litigation expenses provision unless the severance agreement had been triggered. We hold that an executive who has previously resigned for personal reasons is unable to seek to obtain benefits *provided* by this severance agreement, just as an executive seeking severance benefits for a termination event that occurred three years and one week after a change of control could not seek benefits under the agreement.

It was not unreasonable to construe the litigation expenses provision to deny attorney's fees sought by an executive who had already resigned for personal reasons before claiming severance benefits for a termination event. Accordingly, the district court did not abuse its discretion in construing the agreement to deny attorney's fees under the circumstances of this dispute.

**Legal and factual sufficiency**

In its only finding of fact concerning the denial of attorney's fees, the district court found: "Plaintiff did not seek to obtain or enforce any right or benefit provided by the Severance Agreement." Ludwig contends that the evidence is legally and factually insufficient to support this finding and contends that evidence in the record conclusively establishes the opposite. If legally and factually sufficient evidence supports the jury's finding that Ludwig did not terminate her employment for good reason and Encore's contrary contention that Ludwig had already terminated her employment for personal reasons, the district court's finding that Ludwig did not seek benefits *provided* by the agreement would be supported by legally and factually sufficient evidence.

14

Findings of fact in a bench trial have the same force and dignity as a jury verdict and are reviewable for legal and factual sufficiency of the evidence by the same standards as applied in reviewing a jury's findings. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). When considering a factual sufficiency challenge, the reviewing court must consider and weigh all of the evidence, not just the evidence that supports the verdict. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex. 1998); *Nip v. Checkpoint Sys., Inc.*, 154 S.W.3d 767, 768-69 (Tex. App.—Houston [14th Dist.] 2004, no pet.). The reviewing court may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *Maritime Overseas Corp.*, 971 S.W.2d at 407. The reviewing court does not serve as a fact-finder and may not pass upon the witnesses' credibility or substitute its judgment for that of the fact-finder, even if the evidence would clearly support a different result. *Id*. In a legal sufficiency review, "appellate courts must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). The test for legal sufficiency is whether the evidence at trial "would enable reasonable and fair-minded people to reach the verdict under review." *Id*. at 827.

Encore argued at trial that Ludwig did not terminate her employment for a good reason because she had voluntarily resigned for personal reasons. On December 1, 2001, she informed her supervisor, J.D. Webb, that she would be leaving the company and moving to Pennsylvania to be with her husband. Ludwig responded that she did not "actually resign" in

15

December, she merely notified Encore that she would be resigning soon. Rather, she argued that her resignation took place in March because of the strain of the increase in required travel.

Webb testified that he believed that Ludwig was tendering her resignation in December 2001. He considered her resignation to be official then and began the process of replacing her. Webb told then president Craig Smith and Kathy Weiderker, Encore's vice president of human resources, that Ludwig was resigning. Webb added that he periodically began to check in with Ludwig regarding the status of the sale of her house so that he would know when to bring in her replacement. On cross-examination, Webb stated that he began advertising for Ludwig's replacement in January 2002 and that he, with Ludwig's assistance, began interviewing applicants soon after. Finally, Webb explained that he reacted with "total surprise" to Ludwig's March 2002 resignation letter because she had already resigned; he had posted the position, and he and Ludwig had interviewed applicants well before March 1. He also explained that after she announced her resignation in December, the company agreed to accommodate Ludwig's request to stay on until her house sold.

Ludwig testified that her only resignation from Encore occurred on March 1, 2002. She explained that her decision to resign was in direct response to increased travel requirements, which had significantly impaired her ability to care for her daughter since her husband had moved out of state. On cross-examination she conceded that she did not openly object to the increase in travel until February 2002, and that no one ever told her that she was required to go on any of the trips. She also admitted that the two times when she did complain, the trip was postponed. On cross, she had this response to questioning about her reasons for leaving Encore:

16

Q: It's correct, is it not, that your husband, Ken, accepted a job in Pennsylvania in November of 2001.

A: That's correct.

Q: And at that point in time, you knew that you were quitting your job at Encore Orthopedics and moving to Pennsylvania.

A: Eventually, yes.

Q: And it's also correct, is it not, that the ultimate reason that you quit was because your husband got a job out of state.

A: Ultimately, yes.

\* \* \*

Q: Now, you told Mr. Webb, did you not, that you had already made a decision that you were leaving as soon as your house in Cedar Park was sold, right?

A: In December, yes.

Q: It didn't matter what your travel requirements were, you were already decided to move.

A: That is correct.

Q: It didn't matter what your job responsibilities were, you had already decided to move.

A: We had decided to move, yes.

Ludwig also confirmed that she told the applicants she interviewed to replace her that she was leaving the company to move out of state, not because of an increase in travel. In addition, she acknowledged that, starting in December 2001, she began to tell people in the office that she was leaving the company because her husband took a job out of state. She admitted that she told this to

17

Craig Smith and Harry Zimmerman. Encore's consistent defense to Ludwig's claims was that she had already resigned for personal reasons.

Ultimately, the jury was asked to determine whether Ludwig terminated her employment for good reason, as that term was defined by the severance agreement. The jury answered "no." The jury was in the best position to judge the credibility of Ludwig and the Encore witnesses to determine when and why she resigned. After reviewing the record, we conclude that the evidence presented at trial would enable reasonable and fair-minded people to reach a similar determination. *City of Keller*, 169 S.W.3d at 827. Nor is the jury's determination so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Maritime Overseas Corp.*, 971 S.W.2d at 407. Therefore, the record contains legally and factually sufficient evidence supporting the jury's finding that Ludwig did not terminate her employment for good reason because she had already resigned for personal reasons.

At the post-trial hearing on Ludwig's motion for attorney's fees, the parties agreed that the district court could and should consider all of the evidence presented throughout the trial. This included Encore's evidence that Ludwig had already resigned for personal reasons before she sought benefits under the severance agreement. We have already determined that there is a latent ambiguity as to whether litigation expenses must be paid for any claim made under the agreement, and that in some narrow circumstances fees may be denied for suits not contemplated by the agreement. The evidence that Ludwig had already resigned for personal reasons supports the district court's single finding that Ludwig "did not seek to obtain or enforce any right or benefit under the Severance Agreement."

18

This finding supports the district court's first conclusion of law: "Plaintiff is not entitled to any attorney's fees and expenses incurred in the prosecution of her claims against Defendants in this suit." If Ludwig had already resigned for personal reasons, the severance agreement provided no more benefits than if she had resigned more than three years after the change in control. Under such a circumstance, the district court's conclusion of law is correct and is supported by its finding of fact. *McIntyre v. Comm'n for Lawyer Discipline*, 169 S.W.3d 803, 806-07 (Tex. App.—Dallas 2005, no pet.).

Having upheld the district court's denial of attorney's fees on these grounds, we need not address its alternative conclusion that if the litigation expenses provision could be construed to award attorney's fees to a non-prevailing party, it is void as against public policy.

## CONCLUSION

We uphold the district court's denial of litigation expenses on the narrow circumstances of this dispute and affirm the judgment in all respects.

_____

Bea Ann Smith, Justice

Before Justices B. A. Smith, Patterson and Puryear

Affirmed

Filed: March 9, 2006

19