TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-05-00027-CV






Craig Nickels and Sheila Nickels, Appellants


v.


James Casburg; James W. Casburg, Sr.; Joe F. McNair; Charles Anderson; Daniel W.
Casburg; Mamie L. Hollan; Vernon L. Crane; Kent A. Schooler; Kerin J. Schooler;
Marvin Moring; Richard G. Washington; Eileen Washington; Richard Naber; Madelyn
Naber; Graciela Pena; Ayron Brooks; Robert W. Ruggiero; Sally B. Ruggiero; David
Mathews; Freda Mathews; David Mathews II; Linda McNair; Fred Nelson; Marie
Claymore; Flat Creek Limited; Kent Alden Schooler and Kerin Jo Schooler, Trustees of
Schooler Living Trust; Patricia Sue Maloney; Rory A. McLaughlin; Sallie McLaughlin;
Robert W. Ruggiero, Individually and as authorized agent of the Texas Veterans Land
Board; George Ruggiero, Individually and as authorized agent of the Texas Veterans Land
Board; and Tina Broderick, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT

NO. GN300526, HONORABLE PAUL DAVIS, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N



 This appeal concerns the existence and scope of an easement to use a lakeside tract
on Lake Travis as a recreation and private park area. Craig and Sheila Nickels, the owners of the
lakeside tract and other land in the subdivision Travis Peak Estates, appeal the district court's
judgment in favor of appellees who are property owners and residents in the subdivision. (1) The
district court declared that appellees have an easement to use the lakeside tract as a recreation and
private park area and granted appellees' requests for injunctive relief and attorney's fees. For the
reasons that follow, we affirm the district court's judgment. 


BACKGROUND


Creation of Travis Peak Estates


 In 1962, P&W Co. acquired a 2,052.75-acre tract of land on the north shore of Lake
Travis in Travis County that was part of the Joshua English Survey No. 2 to create the Travis Peak
Estates subdivision. James Watson, one of the principals of P&W Co., prepared but did not record
a subdivision plat for Travis Peak Estates in 1962, subdividing the 2,052.75-acre tract. The
subdivision plat shows the location and configuration of tracts and roads, including a 50-foot
roadway easement ("Roadway Easement") and the four-acre lakeside tract in dispute (the "Lakeside
Tract"). On the subdivision plat, the Roadway Easement ends at the entrance to the Lakeside Tract,
and the Lakeside Tract is identified as "EASEMENT AREA FOR USE OF TRAVIS PEAK
ESTATES OWNERS." (2) P&W Co. cleared the Lakeside Tract and constructed a road along the
Roadway Easement and a concrete boat ramp within the Lakeside Tract. P&W Co. recorded a
description of the Roadway Easement and the Lakeside Tract--identified as the "easement area"--
by metes and bounds in January1963 at Volume 2566, Page 225, of the Travis County Deed Records. 

 From 1963 to 1971, P&W Co. marketed and sold the tracts in Travis Peak Estates,
executing 21 deeds to original purchasers. (3) P&W Co. provided prospective purchasers with a copy
of the subdivision plat that identified the Lakeside Tract as the "easement area" for use by property
owners of Travis Peak Estates. Many of the tracts did not have access to Lake Travis without the
Lakeside Tract. The property owners in Travis Peak Estates had access to and used the Lakeside
Tract without interruption from the 1960s until the present dispute. Their use included a 917 square
foot area ("917-SF area") that is adjacent to the Lakeside Tract and located on a separate tract of land
that the Nickelses purchased. The property owners' uses of the 917-SF area included using it as a
"turnaround" area in conjunction with launching boats from the boat ramp. 


The Controversy


 Craig and Sheila Nickels purchased two adjacent tracts of property in Travis Peak
Estates--a 60.003-acre tract and a 10.279-acre tract--that were part of the last tract in Travis Peak
Estates conveyed by P&W Co. in January 1971 to an original purchaser. The 10.279-acre tract
includes the Lakeside Tract and a segment of the Roadway Easement leading to the Lakeside Tract. 
The Nickelses purchased the 60.003-acre tract from Westlake, I.G., on June 19, 1997. On the same
day, the Nickelses, Westlake, and Peninsula Investments, LLC, an entity related to Westlake, I.G.,
entered into a "Reciprocal Easement, Conveyance and Escrow Agreement." (4) The parties agreed that
Peninsula would convey the 10.279-acre tract to the Nickelses in exchange for the Nickelses
conveying an easement on the 60.003-acre tract. 

 The general warranty deed for the 60.003-acre tract describes the tract conveyed as
"60.003 acres of land, more or less, out of the Joshua English Survey No. 2, in Travis County." The
warranty deed also references the document that P&W Co. recorded in 1963 at Volume 2566, Page
225 of the Travis County Deed Records and excepts from the Nickelses' title the rights of the
property owners in Travis Peak Estates to use the "easement area":

 

 Subject to the rights of the Owners in Travis Peak Estates for the use of the easement
area described on the plat contained within the instrument recorded in Volume 3978,
Page 1401, Deed Records of Travis County, Texas.



 The Nickelses' title policy to the 60.003-acre tract similarly subjects the Nickelses'
title "to the rights of the Owners in Travis Peak Estates for the use of the easement area described
on the plat contained within the instrument recorded in Volume 3978, Page 1401, Deed Records of
Travis County." The instrument recorded in Volume 3978, Page 1401, was an option contract that
had attached to it a plat drawing depicting the Lakeside Tract as the "EASEMENT AREA FOR USE
OF TRAVIS PEAK ESTATES OWNERS." (5) 

 The title policy covered the 60.003-acre tract as "Tract 1" and the "easement" estate
as "Tract 2":


 TRACT 2: EASEMENT ESTATE created by that certain instrument dated January
3, 1963, between JAMES T. WATSON, REGISTERED PUBLIC SURVEYOR NO.
290, and the RECORD OWNERS, recorded in Volume 2566, Page 225, Deed
Records of Travis County, Texas, and as granted in Volume 3380, Page 542, and
Volume 4431, Page 1523, Deed Records of Travis County, Texas.



The Nickelses' purchase contract for the 60.003-acre tract also had attached to it a drawing
showing the Lakeside Tract identified as the "easement area" with a "conc. ramp" adjacent to their
60.003-acre tract. 

 Several months later, the Nickelses completed their purchase of the 10.279-acre tract
from Peninsula in exchange for granting Peninsula a temporary private access easement across the
60.003-acre tract for the benefit of other property Peninsula retained. The Nickelses did not pay cash
consideration and did not obtain a title policy on the 10.279-acre tract. The general warranty deed
conveying the 10.279-acre tract identifies the property being conveyed:


 Property (including any improvements): 10.279 acres, more or less, out of the Joshua
English Survey No. 2, Travis County, Texas as more particularly described by metes
and bounds in Exhibit "A" attached hereto and incorporated by reference.



"Exhibit A" is "field notes" prepared in May 1997 by Watson Surveying, (6) that describe the property
conveyed:


 Field Notes for 10.279 acres out of the Joshua English Survey No. 2, Travis County,
Texas, being part of a 386.4 acre tract . . . , also being part of that unrecorded
subdivision plat by James T. Watson, registered professional land surveyor No. 290,
surveyed in December of 1962 and titled "Travis Peak Estates," said 10.279 acres
being composed of a 50 road easement and adjacent easement area as recorded in
Volume 2566, Page 225, and Volume 3240, Page 1165 . . . .



The document includes the address and telephone number for Watson Surveying. 

 After the Nickelses purchased their properties and built a home on the 60.003-acre
tract, disputes arose between the Nickelses and various property owners in Travis Peak Estates,
including the property owners' right to use the Lakeside Tract. In 2002, the Nickelses locked the
entry gate into the Lakeside Tract. 


Litigation Commenced


 The dispute between the parties continued, culminating in the Nickelses bringing this
suit in 2003. The Nickelses sought a declaration as to the parties' respective rights to use the
"easement area." The Nickelses also sought injunctive relief and monetary damages from certain
individual appellees for trespass, nuisance, intentional infliction of emotional distress, assault,
battery, threat of bodily injury, and civil conspiracy. (7) In their counterclaims, appellees sought
declaratory relief regarding their use of the "easement area" under the legal theories of easement by
express grant, implied easement, easement by prescription, and easement by estoppel. They also
sought injunctive relief and attorney's fees. During the pendency of the suit, the district court
enjoined the Nickelses from interfering with appellees' use of the "easement area," and the Nickelses
fenced off the 917-SF area located on the 60.003-acre tract.

 The trial was to the bench. The Nickelses' witnesses included Mr. Nickels, Mrs.
Nickels, and Jim Erdeljac, the Nickelses' real estate broker on the 60.003-acre tract. The Nickelses
testified to the circumstances surrounding their purchase of the two tracts, visits to the property prior
to their purchase, their understanding and investigation of the rights of Travis Peak Estates property
owners to use the "easement area," and their confrontations with Travis Peak Estates property
owners after their purchase. (8) They testified that they had a copy of a map or drawing depicting the
Roadway Easement and the "easement area" with a "concrete ramp" prior to closing on their
properties, and that they "had noticed" the "depiction of the easement area and the concrete ramp." 
They also testified that they obtained title to the 10.279-acre tract without clarification of the
property owners' rights to use the "easement area" and without title insurance, they did not visit the
Lakeside Tract until after they completed the purchase of the 60.003-acre tract, they pay "nominal"
property taxes on the 10.279-acre tract, and they did not pay monetary consideration for the
10.279-acre tract. (9) 

 Mr. Nickels testified to the Nickelses' reasons for purchasing the 10.279-acre tract:


 Q. Given what you've told me about what you knew when you closed on your
60-acre property and what you didn't know, am I to understand that you were
giving--you and your wife were giving a 30-foot easement [to Peninsula]
across your 60-acre property in exchange for a deed to property that had an
encumbrance, if you will, an easement, for these Travis Peak Estates owners
who you didn't know what that was or who they were and didn't know and
didn't care. You were willing to make that trade in the blind, so to speak?


 A. It solved our access problem to the 60 acres.


* * *


 Q. Okay. Well, are--by that are you saying that you didn't really care about the
easement area, what you cared about was the 50-foot roadway easement on
the east side of your property so that you could get into your property?


 A. When we were--the whole trade was set up to get us access to the 60 acres.


* * *


 Q. And the easement area down at the cove that's in dispute here, was not
necessary for access to your property, was it?


 A. No, it was not.


 Q. So is it accurate that that was just an add-on, if you will, that really was not
part of your thinking of the--of what you were trading there?


 A. It was presented to us as here's what we will offer for the 30-foot easement. 
It wasn't this par[cel] and that par[cel]. It was just--


 Q. Okay. Well, you were willing to give this easement across your property and
receive title to the 50-foot roadway easement along the east side of your
property and title to the four-and-a-half acre easement tract. And as far as the
four-and-a-half easement--four-and-a-half acre easement tract was
concerned, you didn't know and you didn't care who had the right to go down
there; is that accurate?


 A. We had asked a lot of people. Nobody seemed to care. So I assumed that
there was not much too worry about it, that's correct. (10)



Erdeljac testified to his visits to the properties with the Nickelses before they purchased the
properties, and to his conversations with the Nickelses concerning the "easement area" but that he
was not involved in the Nickelses' negotiation and purchase of the 10.279-acre tract.

 Appellees' witnesses included present and past property owners in Travis Peak
Estates; family members of property owners; James Watson, the sole surviving principal of P&W
Co.; Stuart Watson; and George Sanders, a surveyor who prepared a metes and bounds description
of the 917-SF area in 2004. Property owners testified consistently to their respective purchases of
property in Travis Peak Estates and their understanding that they had the right to use the Roadway 
Easement and the "easement area" as a recreation and private park area when they purchased their
properties; improvements that they made to their properties; their use, maintenance, and repairs of
the Roadway Easement, the "easement area," and the 917-SF area; their use of the 917-SF area as
a "turnaround" area in conjunction with the boat ramp; and to confrontations with the Nickelses. 

 James Watson testified that: (i) P&W Co. intended for the "easement area" to be a
recreation and private park for property owners in Travis Peak Estates; (ii) he made representations
to that effect to prospective purchasers; (iii) P&W Co. provided marketing materials to prospective
purchasers including the subdivision plat of Travis Peak Estates; (iv) he performed survey work on
Travis Peak Estates and he testified to the scope of that work; and (v) P&W Co. constructed the road
and boat ramp and cleared the "easement area" prior to selling tracts in the subdivision. (11)

 Exhibits at trial included the deeds from P&W Co. to original purchasers, as well as
subsequent deeds in appellees' respective chains of title, differing versions of the subdivision plat
of Travis Peak Estates, the document that Watson prepared and recorded in 1963 describing by metes
and bounds the Roadway Easement and the "easement area," and the document prepared by Sanders
in 2004 describing by metes and bounds the 917-SF area. At the conclusion of the evidence,
appellees stipulated that they were not seeking "fee simple" but a prescriptive easement to the
917-SF area. 

 The district court entered judgment in favor of appellees, declaring that "Travis Peak
Estates Property Owners (12) (and their invited family members, guests and invitees accompanied by
a Travis Peak Estates Property Owner), tenants, successors and assigns" have "an easement to
use the Easement Area as a recreation and private park area," setting forth "permitted activities"
and declaring:


 The Travis Peak Estates Property Owners (and their invited family members, guests
and invitees accompanied by a Travis Peak Estates Property Owner), tenants,
successors and assigns shall be permitted free access to the Easement Area at all
times. 



The district court defined the "Easement Area" to mean the "land described as Easement Area on
the James T. Watson Field Notes recorded in Volume 2566, Page 225, Travis County Real Property
Records, together with that certain additional area comprising 917 square feet, more or less,
described more particularly on Exhibit 'A' attached hereto and incorporated herein by reference for
all purposes." Exhibit "A" is the document that Sanders prepared in 2004 describing the 917-SF area
by metes and bounds. The district court also enjoined the Nickelses from interfering with appellees'
permitted uses of the "Easement Area" as defined by the district court and the Roadway Easement
and awarded appellees attorney's fees and costs. (13) 

 The district court entered findings of fact and conclusions of law. In its findings of
fact, it defined the "Easement Area" separately from the 917-SF area. (14) The district court's findings
of fact included:


 1. Beginning in approximately 1962, P&W Co. as owner subdivided the tract
comprising 2,052.75 acres, more or less, which was located in Travis County
on Lake Travis, into tracts and lots and then marketed the lots and tracts to
the public pursuant to a common scheme or plan of development for the
subdivision known as Travis Peak Estates.


 2. In connection with and in furtherance of the marketing and sale of the lots
and tracts in Travis Peak Estates, surveyor James T. Watson, on behalf of the
developer P&W Co. and as one of its principals, prepared a map or plat of the
subdivision ("P&W Map"), which showed the location and configuration of
the lots and tracts in the Travis Peak Estates subdivision, the location of the
roads that would provide ingress, egress, and access to the lots and tracts in
Travis Peak Estates, including the portion of the road easement referred to
herein as the Roadway Easement (which is the portion located on land owned
by Plaintiffs Craig and Sheila Nickels), and the location and configuration of
the Easement Area comprising approximately four acres located on Lake
Travis, which was described on the P&W Map as follows: "EASEMENT
AREA FOR USE OF TRAVIS PEAK ESTATES OWNERS."


 3. In connection with and in furtherance of the marketing and sale of the lots
and tracts in Travis Peak Estates, surveyor James T. Watson, on behalf of the
developer P&W Co. and as one of its principals, also prepared a metes and
bounds description of the Roadway Easement and a metes and bounds
description of the Easement Area that was recorded in the Deed Records of
Travis County, in Volume 2566, at page 225.


 4. In 1962 or 1963, P&W Co. in furtherance of the marketing and sale of lots
and tracts in Travis Peak Estates, P&W Co. constructed the roads in Travis
Peak Estates including along the Roadway Easement leading to the Easement
Area, and on the Easement Area, P&W Co. constructed a concrete boat ramp,
which is still in place, for use by owners of property in Travis Peak Estates.


 5. P&W Co. gave the P&W Map to actual and prospective purchasers of
property in Travis Peak Estates in connection with the marketing and sale of
lots and tracts in Travis Peak Estates.


 6. P&W Co. set aside and reserved the Easement Area for the use of the Travis
Peak Estates Property Owners as a recreation and private park area.


 7. Representatives of P&W Co. made representations, both oral and otherwise,
to purchasers of tracts in Travis Peak Estates that the tracts would be and
were sold with easement rights to use the Easement Area and the Easement
Area was set aside and reserved for use by owners of property in Travis Peak
Estates as a recreation and private park area.


 8. Most of the tracts and lots in Travis Peak Estates do not have frontage on
Lake Travis, and reserving and setting aside the Easement Area, which is
located on Lake Travis, for the use of owners of property in Travis Peak
Estates as a recreation and private park area, was an important and valuable
amenity and benefit to purchasers included within their purchase.


 9. Travis Peak Estates Property Owners are owners of property in Travis Peak
Estates.


 10. P&W Co. included in the deeds to purchasers of lots in Travis Peak Estates
language that expressly incorporated by reference the instrument executed by
James T. Watson, Registered Professional Land Surveyor #290, and recorded
in Volume 2566, at page 225, of the Deed Records of Travis County, which
separately described by metes and bounds a roadway easement running
through Travis Peak Estates and the Easement Area, with these deeds stating
"to which instrument and its record, reference, is here made and same made
a part hereof for all pertinent purposes."


 11. P&W Co. in two of the deeds executed to the purchasers in May 1963 and
June 1965 clarified of record the grant contained in all the deeds to
purchasers in Travis Peak Estates, stating as follows:


 By way of clarification, a portion of the metes and bounds above
referred to as recorded in Vol. 2566, Page 225, of the Deed Records
of Travis County, Texas is described as "easement area" and on that
portion of said land as so described, there has been erected a boat
loading ramp, and the remainder of said "easement area," which
includes more land than just the present roadway as same exists on
the ground is for the use of a recreation and private park area and
Grantor herein in order to avoid any possible misunderstanding
herenow expressly acknowledges that the easement hereinabove
granted in addition to being a road easement is specifically granted of
the right to use all of the area designated as "easement area,"
including the boat loading ramp, said easement as herein granted
being permanent and for the use of Grantee herein, her heirs and
assigns in common with Grantor herein, its successors and assigns,
provided however, Grantor herein make no warranty, express or
implied, to maintain said boat loading ramp.


 12. The deeds, maps and other recorded documents referenced in the granting of
the Travis Peak Estates lots and tracts to the Travis Peak Estates Property
Owners and their predecessors in title grant an express easement appurtenant
to use the Easement Area as a recreation and private park area.


 13. The deeds granting Travis Peak Estates lots and tracts to the Travis Peak
Estates Property Owners include the grant of an express easement
appurtenant to use the Roadway Easement to access the Easement Area.


 14. Plaintiffs Craig Nickels and Sheila Nickels acquired title to the Easement
Area and the Roadway Easement (being that portion of the roadway easement
located on the land that they were purchasing) in December 1997 with actual
and constructive knowledge and notice that the Easement Area and the 917
Square Foot Tract were being used as a recreation and private park area by
property owners in Travis Peak Estates and that the Roadway Easement was
being used for ingress and egress to the Easement Area. The May 1963 and
June 1965 deeds referenced above were in the chain of title of Plaintiffs Craig
and Sheila Nickels.


 15. Continuously since 1962, the Travis Peak Estates Property Owners, their
predecessors in interest, and their guests, family members, invitees, and
tenants have used the Easement Area and 917 Square Foot Tract as a
recreation and private park area for swimming, fishing, picnicking,
sunbathing, use of umbrellas or other sunshades, barbequing, recreational
games, consumption of adult alcoholic beverages consistent with applicable
legal requirements, nighttime use, campfires, boat launching, automobile and
other vehicle parking while engaging in recreational activities, and
automobile and boat trailer parking while boating and fishing, and all
other similar lawful uses of the Easement Area as a recreation and private
park area.


 16. The Travis Peak Estates Property Owners and their predecessors in interest
have maintained, repaired, and improved the roadway leading to the concrete
boat ramp on the Easement Area and the concrete boat ramp on the
Easement Area.



The district court also made particular findings as to each of appellees' legal theories. The district
court's conclusions of law included that appellees have an express easement, easement by estoppel,
implied easement, and easement by prescription to the "Easement Area" and an easement by
prescription to the 917-SF area. This appeal followed.


ANALYSIS


 In seven issues, the Nickelses challenge the district court's declarations regarding
appellees' right to use the "Easement Area" as a recreation and private park area. They contend that
the district court erred in finding an express easement, an implied easement of necessity, an implied
easement by a "general plan" or "common scheme of development," an easement by estoppel, and
an easement by prescription. They also raise lack of standing as to the district court's finding of
easement by estoppel and challenge the district court's finding of an easement by prescription as to
the 917-SF area. In their eighth issue, the Nickelses contend that the district court abused its
discretion when it awarded appellees their attorney's fees and costs. 


Standard of Review

 

 The Nickelses challenge the trial court's interpretation of appellees' express
easement. Basic principles of contract construction govern the terms of an express easement. 
Canyon Reg'l Water Auth. v. Guadalupe-Blanco River Auth., 258 S.W.3d 613, 616 (Tex. 2008);
Marcus Cable Assocs., L.P. v. Krohn, 90 S.W.3d 697, 700-01 (Tex. 2002). An easement should be
interpreted to give effect to the intentions of the parties as ascertained from the language used in the
instrument, or the circumstances surrounding the creation of the servitude, and to carry out the
purpose for which it was created. Marcus Cable Assocs., 90 S.W.3d at 701 (citing Restatement
(Third) of Property (Servitudes) § 4.1 (2000)). 

 The Nickelses challenge the factual and legal sufficiency of the evidence to support
the district court's findings. In an appeal from a bench trial, the trial court's findings of fact "have
the same force and dignity as a jury's verdict upon questions." Anderson v. City of Seven Points,
806 S.W.2d 791, 794 (Tex. 1991); Ludwig v. Encore Med., L.P., 191 S.W.3d 285, 294 (Tex.
App.--Austin 2006, pet. denied). The trial court is the "sole judge of the credibility of the witnesses
and the weight to be given their testimony." McGalliard v. Kuhlmann, 722 S.W.2d 694, 696 (Tex.
1986). The trial court may believe one witness, disbelieve others, and resolve inconsistencies in any
witness's testimony. Id. at 697.

 This Court reviews a trial court's findings of fact for legal and factual sufficiency of
the evidence by the same standards applied to a jury verdict. Ortiz v. Jones, 917 S.W.2d 770, 772
(Tex. 1996); Anderson, 806 S.W.2d at 794; Ludwig, 191 S.W.3d at 294. When reviewing a finding
for legal sufficiency, the reviewing court considers the evidence in the light most favorable to the
judgment, crediting favorable evidence if a reasonable factfinder could, and disregarding contrary
evidence unless a reasonable factfinder could not. City of Keller v. Wilson, 168 S.W.3d 802, 807
(Tex. 2005). When considering a factual sufficiency challenge, the reviewing court considers all of
the evidence and "should set aside the verdict only if it is so contrary to the overwhelming weight
of the evidence as to be clearly wrong and unjust." Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). 
This Court reviews conclusions of law de novo. BMC Software Belgium, N.V. v. Marchand,
83 S.W.3d 789, 794 (Tex. 2002). "The appellant may not challenge a trial court's conclusions of
law for factual sufficiency; however, the reviewing court may review the trial court's legal
conclusions drawn from the facts to determine their correctness." Id. (citations omitted).

 The Nickelses also challenge the district court's award of attorney's fees. "The
Declaratory Judgments Act entrusts attorney fee awards to the trial court's sound discretion, subject
to the requirements that any fees awarded be reasonable and necessary, which are matters of fact, and
to the additional requirements that fees be equitable and just, which are matters of law." Bocquet
v. Herring, 972 S.W.2d 19, 21 (Tex. 1998). A trial court abuses its discretion when it acts
"without reference to any guiding rules and principles." Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 241-42 (Tex. 1985).


Express Easement


 In their first two issues, the Nickelses contend the district court erred when it found
that appellees have an express easement to use the Lakeside Tract as a recreation and private park
area. Relying on the statute of frauds, they contend that the district court erred by looking beyond
the "four corners" in the "relevant 'P&W deed'" in each of appellees' respective chains of title and
that the district court should have concluded as a matter of law that appellees' own deeds and the
deeds in their respective chains of title do not contain an express easement to the Lakeside Tract for
use as a recreation and private park area. The Nickelses contend that the district court erred by
considering two deeds that were not in appellees' respective chains of title and other extrinsic
evidence and parol testimony to expand the easement language in appellees' deeds to include the
Lakeside Tract as a recreation and private park area. 

 An express easement is an interest in land to which the statute of frauds applies. See
Tex. Bus. & Com. Code Ann. § 26.01 (West Supp. 2008); Pick v. Bartel, 659 S.W.2d 636, 637 (Tex.
1983) (easement is interest in land subject to statute of frauds); West Beach Marina, Ltd. v. Erdeljac,
94 S.W.3d 248, 264 (Tex. App.--Austin 2002, no pet.) (same). The statute of frauds requires that
the easement provide enough detail that the court may determine the intent of the parties, the
essential terms of the easement, and an adequate description of the location of the easement, without
resort to extrinsic evidence. Pick, 659 S.W.2d at 637; Erdeljac, 94 S.W.3d at 264. "'To be
sufficient, the writing must furnish within itself, or by reference to some other existing writing, the
means or date by which the land to be conveyed may be identified with reasonable certainty.'" 
Erdeljac, 94 S.W.3d at 264 (quoting Morrow v. Shotwell, 477 S.W.2d 538, 539 (Tex. 1972)). 
Whether an agreement falls within the statute of frauds is a question of law. Id. 

 The parties agreed that the nineteen deeds to original purchasers in appellees'
respective chains of title conveyed the respective properties with appurtenances and contained
substantially the same language concerning easement rights:


 For the same consideration above stated, Grantor has granted and conveyed,
and by these presents does grant and convey, unto the said [purchaser], their heirs and
assigns, the free and uninterrupted use, liberty, privilege, and easement of passing in
and along a certain way across the above mentioned 2052.75 acre tract, said way
being described by metes and bounds in that instrument recorded in Vol. 2566, page
225, Deed Records of Travis County, Texas, to which instrument and its record,
reference is here made and same made a part hereof for all pertinent purposes,
together with free ingress, egress and regress to and for the said [purchaser], their
heirs and assigns, and their tenants, by foot, with cart, wagons, carriages, automobiles
and other vehicles, mules or livestock, as by them shall be necessary or convenient
at all times and seasons forever, in, along, upon and out of said way, in common with
the Grantor herein, its successors and assigns, and its and their tenants; to have and
to hold all and singular the rights and privileges aforesaid, to them, the said
[purchasers], their heirs and assigns, to their proper use and behoof, in common with
Grantor herein, its successors and assigns, and its and their tenants, provided,
however, nothing herein contained shall be construed as requiring the Grantor to
maintain the condition of said easement or to police the use thereof.



 The Nickelses focus on the lack of granting language in the deeds from P&W Co. to
original purchasers as to the "easement area" or its use as a "recreation area or private park" to
contend that the reference in the deed to the "instrument recorded in Vol. 2566, page 225" was
limited to the Roadway Easement. Appellees respond by focusing on the reference and incorporation
"for all pertinent purposes" of the "instrument recorded in Vol. 2566, page 225" that describes the
"easement area" by metes and bounds. Whether the deeds from P&W Co. to the original purchasers
in appellees' chains of title standing alone would satisfy the statute of frauds and grant an express
easement to use the "easement area" as a recreation and private park area is a close question. See
Cummins v. Travis County Water Control & Improvement Dist. No. 17, 175 S.W.3d 34, 51-52 (Tex.
App.--Austin 2005, pet. denied) (lack of express easement conclusively established through
claimants' chain of title). But the deeds in appellees' respective chains of title do not stand alone
and are not dispositive here. 

 A purchaser of real property "is bound by every recital, reference and reservation
contained in or fairly disclosed by any instrument which forms an essential link in the chain of title
under which he claims." Westland Oil Dev. Corp. v. Gulf Oil Corp., 637 S.W.2d 903, 908 (Tex.
1982) (citation omitted) (emphasis in original); see Adams v. Rowles, 228 S.W.2d 849, 853 (Tex.
1950) (respondent's chain of title showed dedication of roadway, and respondent was charged with
knowledge of its existence and "took his land burdened with the roadway"); McDaniel v. Calvert,
875 S.W.2d 482, 484 (Tex. App.--Fort Worth 1994, no writ) (transfer of dominant estate
"automatically includes the [appurtenant] easement across the servient tenement's land" regardless
of whether easements are referenced in deed or not); see also Tex. Prop. Code Ann. § 13.002(1)
(West 2003) ("An instrument that is properly recorded in the proper county is . . . notice to all
persons of the existence of the instrument."); City of Richland Hills v. Bertelsen, 724 S.W.2d 428,
430 (Tex. App.--Fort Worth 1987, writ denied) (prospective purchasers of land have constructive
notice of documents recorded in real property records in county where land is located).

 We turn then to a review of the documents in the Nickelses' chain of title. The
general warranty deed conveying the 10.279-acre tract to the Nickelses references the document
recorded in Volume 2566, Page 225, that identifies the Lakeside Tract as the "easement area," and
describes its location by metes and bounds. Exhibit "A" to the general warranty deed conveying the
10.279-acre tract to the Nickelses describes the tract as being "composed of a 50 road easement and
adjacent easement area as recorded in Volume 2566, Page 225," and also references the "unrecorded
subdivision plat by James T. Watson . . . surveyed in 1962." The unrecorded subdivision plat,
although revised from time to time, identifies the Lakeside Tract as the "EASEMENT AREA FOR
USE OF TRAVIS PEAK ESTATES OWNERS." These documents expressly referenced in the
Nickelses' chain of title are binding on the Nickelses and are sufficient to satisfy the statute of frauds
as to Travis Peak Estates property owners' easement to use the Lakeside Tract. See Westland Oil
Dev. Corp., 637 S.W.2d at 908; Erdeljac, 94 S.W.3d at 264 (statute of frauds may be satisfied "by
reference to some other existing writing"); Anderson v. McRae, 495 S.W.2d 351, 361 (Tex. Civ.
App.--Texarkana 1973, no writ) (judgment affirmed in which trial court "sitting as the trier of fact
concluded that the [property owners] acquired easements appurtenant over the disputed areas
[including recreational areas] by grant because the lots were sold by reference to plats which
designated and reserved such rights and appurtenances"); see, e.g., Rakowski v. Committee to Protect
Clear Creek Vill. Homeowner's Rights & Preserve Our Park, 252 S.W.3d 673, 677-78 (Tex.
App.--Houston [14th Dist.] 2008, pet. denied) (even when restrictions reserving "recreational area"
for the use and enjoyment of those owning or occupying residential lots not recited in deed, "property
may become subject to the restrictions and covenants of a general plan of development . . . by an
express reference to the restrictions and covenants in the conveyance documents, which are
duly recorded"). (15) 

 Additionally, the district court could have concluded that the Nickelses were bound
by the subdivision plat whether or not they had notice of it because they did not pay valuable
consideration for the 10.279-acre tract. See Tex. Prop. Code Ann. § 13.001 (West 2003) (An
"unrecorded instrument" relating to a "conveyance of real property or an interest in real property"
is "binding on . . . a subsequent purchaser who does not pay a valuable consideration or who has
notice of the instrument."). The Nickelses did not pay monetary consideration or obtain title
insurance for the 10.279-acre tract that included lakefront property on Lake Travis. 

 We conclude that the evidence was legally and factually sufficient to support the
district court's findings concerning appellees' express easement and that the district court did not
err in concluding appellees have an express easement appurtenant to use the Lakeside Tract as a
recreation and private park area. See City of Keller, 168 S.W.3d at 807; BMC Software Belgium,
83 S.W.3d at 794; Erdeljac, 94 S.W.3d at 264. We overrule the Nickelses' first and second issues.


Easement by Estoppel


 In their sixth and seventh issues, the Nickelses contend that the district court erred
in finding that appellees, individually or collectively, satisfied their burden to show an easement by
estoppel. The Nickelses also challenge the standing of all appellees except the Morings and Ms.
Maloney, who were original purchasers of property from P&W Co., because the other appellees
provided no evidence of representations made to prior owners in their respective chains of title. 

 The district court's findings of fact as to appellees' claim of easement by estoppel
included:


 17. The purchasers of lots and tracts in Travis Peak Estates were and would have
been reasonable in believing the representations made by P&W Co. that the
Easement Area was set aside as a recreation and private park area for use of
Travis Peak Estates Property Owners.


 18. The purchasers of tracts in Travis Peak Estates relied on the representations
made by P&W Co. that the Easement Area was set aside as a recreation and
private park area for the use of Travis Peak Estates Property Owners as a
material inducement to the purchase of their properties in Travis Peak
Estates.


 19. Successors to the original purchasers from P&W Co., including the Travis
Peak Estates Property Owners, relied on representations that the Easement
Area was set aside as a recreation and private park area for the use of Travis
Peak Estates Property Owners as a material inducement to the purchase of
their properties in Travis Peak Estates.


 The district court's conclusions of law as to appellees' easement by estoppel included:

 

 8. The Travis Peak Estates Property Owners, their successors, assigns and
tenants have acquired an easement by estoppel entitling the Travis Peak
Estates Property Owners (and their invited family members, guests, and
invitees accompanied by a Travis Peak Estates Property Owner), tenants,
successors, and assigns to use the Easement Area as a recreation and private
park area.


 9. The following uses of the Easement Area are reasonably within the scope of
the representations giving rise to the easement by estoppel: swimming,
fishing, picnicking, sunbathing, use of umbrellas or other sunshades,
barbequing, recreational games, consumption of adult alcoholic beverages
consistent with applicable legal requirements, nighttime use, campfires, boat
launching, automobile and other vehicle parking while engaging in
recreational activities, and automobile and boat trailer parking while boating
and fishing, and all other similar lawful recreational and private park uses.


 10. The following uses of the Easement Area and the Roadway Easement Area
are reasonably within the scope of the representations giving rise to the
easement by estoppel: maintain, repair, and improve the concrete boat ramp
on the Easement Area and the roadway leading to the concrete boat ramp on
the Easement Area.



 The doctrine of equitable estoppel provides an exception to the statute of frauds to
prevent injustice and protect innocent parties from fraud. Storms v. Tuck, 579 S.W.2d 447, 451
(Tex. 1979); Machala v. Weems, 56 S.W.3d 748, 756 (Tex. App.--Texarkana 2001, no pet.). The
essence of the doctrine of easement by estoppel is that the owner of a servient estate may be estopped
to deny the existence of an easement by making representations that are acted on by the owner of the
dominant estate. Drye v. Eagle Rock Ranch, Inc., 364 S.W.2d 196, 209 (Tex. 1962). The doctrine
is not clearly defined, and its application depends on the facts of each case. Id.

 Easement by estoppel requires proof of three elements: (1) a representation of the
easement communicated, either by words or action, to the promisee; (2) the communication was
believed; and (3) the promisee relied on the communication. Storms, 579 S.W.2d at 452; Vinson v.
Brown, 80 S.W.3d 221, 229 (Tex. App.--Austin 2002, no pet.); Stallman v. Newman, 9 S.W.3d 243,
246 (Tex. App.--Houston [14th Dist.] 1999, pet. denied); Holden v. Weidenfeller, 929 S.W.2d 124,
131 (Tex. App.--San Antonio 1996, writ denied). "In order to create an easement by estoppel,
something must be said or done by the owner of the servient estate at the time of the grant of the
dominant estate that induces the acceptance of the grant." Lakeside Launches, Inc. v. Austin Yacht
Club, Inc., 750 S.W.2d 868, 872 (Tex. App.--Austin 1988, writ denied) (citation omitted). 

 As an initial matter, we consider the Nickelses' standing argument. The Nickelses
separate appellees into two categories: (1) those who purchased their property after 1971 from
someone other than P&W Co. and "thus had no first hand knowledge regarding the original
transaction" and (2) those who were original purchasers of property from P&W Co. The Nickelses'
standing argument is directed at the first category of appellees. But, once created, an easement by
estoppel is binding on the successors in title to the servient estate if reliance on the existing easement
continues. Vinson, 80 S.W.3d at 229; Holden, 929 S.W.2d at 131. Standing to assert an easement
by estoppel, therefore, was not limited to original purchasers. See North Clear Lake Dev. Corp. v.
Blackstock, 450 S.W.2d 678, 684 (Tex. Civ. App.--Houston [14th Dist.] 1970, writ ref'd n.r.e.)
(judgment affirmed that made no distinction between various lot owners claiming easement to use
tract of land because tract owner's "statements, conduct, and failure to act do not demonstrate that
he intended to treat different parts of [tract] as being susceptible to different uses by different lot
owners" and "[a]ll of his statements, conduct, and failure to act [were] calculated to induce all of the
adjoining lot owners to believe that [tract] was available to them for the purpose of enjoying
waterfront rights in their lots"). We turn then to the Nickelses' argument that no appellee presented
legally or factually sufficient evidence as to all three elements to support the district court's finding
of an easement by estoppel.

 James Watson's testimony supports appellees' claims that P&W Co. represented it
was granting property owners in Travis Peak Estates an easement to use the Lakeside Tract as a
recreation and private park area. He testified, as the sole surviving principal of P&W Co., that P&W
Co. represented to prospective purchasers that the "easement area" was for use of property owners
in Travis Peak Estates as a recreation and private park area:

 

 [W]e decided we needed an easement area down on the lake front in a cove, because
the majority of the tracts don't have lake fronts. And we wanted to be able to sell
people with the idea they would have access to the lake. And we even built a
concrete boat ramp down there.


* * *


 We built the boat ramp so people could have access to the lake and be able to launch
their boats and go fishing. 


* * *

 We told the folks that, you know, it's a picnic area, the four acres, plus the waterfront
available for their use, the boat ramp. And there's large trees there. It's a--it's just
a nice private park. But its intended to be a private park.


* * *

 For the use of the people--anyone that owned any acreage in the [2],052.75-acre
tract.


 

Watson also testified that P&W Co. provided copies of the subdivision plat of Travis Peak Estates
to prospective purchasers that depicted the "easement area" for use by the property owners. The Nickelses contend that Watson's testimony was "legally and factually insufficient
to fill in the large evidentiary gaps" appellees had, "individually and collectively." They focus on
his testimony during cross-examination, including that the other two principals--a real estate
attorney and salesmen--handled showing the property, negotiated and closed the original purchases,
and drafted the earnest money contracts and deeds. But P&W Co.'s actions that remained visible
and in place also support appellees' claims that P&W Co. represented to purchasers that the Lakeside
Tract was an "easement area" for use by Travis Peak Estates property owners. See Holden,
929 S.W.2d at 132 ("trial court could have reasonably inferred" that the conduct of the owner of the
servient estate and successors in title led the owners of dominant estate "to believe that they had a
right to use the road in question and that such right was relied upon"). It was undisputed that P&W
Co. constructed the road leading to the Lakeside Tract and the boat ramp within the Lakeside Tract,
cleared the Lakeside Tract, and recorded the stand-alone metes and bounds description of the
Roadway Easement and the Lakeside Tract as the "easement area" prior to selling any tracts in
Travis Peak Estates. These actions remained visible and in place at the time appellees purchased
their respective properties in Travis Peak Estates and support the district court's finding that "P&W
Co. made representations, both oral and otherwise, to purchasers of tracts in Travis Peak Estates that
the tracts would be and were sold with easement rights to use the Easement Area." 

 Testimony from property owners also supports the district court's findings as to
representations, as well as supporting the elements of belief and reliance. Past and present property
owners testified that they believed P&W Co.'s representations and relied upon them in purchasing,
pricing, and improving their property, the Roadway Easement, and the Lakeside Tract. Ms.
Maloney, an original purchaser, testified that she purchased her property in the summer of 1963 and
that before the purchase, one of the principals from P&W Co. drove her "down to the easement area"
and there was a "steep boat ramp and a picnic table" and the principal "described--as I understand
it, the ability to have picnics and outings and so forth. This was our easement to the lake." She also
testified to her families' use of the area after she purchased the property and answered "no" when
asked whether she would have purchased the property without access to the "easement area" and
when asked if any one had ever tried to stop her from using the area. 

 Mrs. Moring, another original purchaser, testified that she and her husband purchased
their property in November of 1963 and that a principal of P&W Co. showed them the "easement
area with the boat ramp"; to her understanding that they could use the easement area "[f]or general
recreation, boating, swimming, picnicking"; that they made improvements to their property; that they
would not have bought their property without the use of the "easement area"; and that she was given
a plat of "the whole area" on their "first visit out there." She also testified that when the P&W Co.
principal showed her the "easement area," that he told her that the area was "for the use of Travis
Peak Estates owners . . . and their children."

 Subsequent purchasers of property in Travis Peak Estates testified consistently that
they understood when they purchased their property that property owners had the right to use the
"easement area" and that they used it as a recreation and private park area regularly without
interruption until the current dispute. Property owners testified that they used the "easement area"
for camping, parties, launching boats from the boat ramp in conjunction with the 917-SF area,
swimming, parking vehicles and boat trailers, and other recreation. Property owners also testified
that they maintained and repaired the road leading to the "easement area," the "easement area"
including the 917-SF area, and that they relied on the lake access and the "easement area" in deciding
to purchase property in Travis Peak Estates and determining the value and price of their properties. 

 The Nickelses contend that they were "good-faith purchasers of their property" and
that they had no actual or constructive notice or knowledge of any "such alleged representations" by
P&W Co. to bind them to an easement by estoppel. But, the evidence at trial was that the Nickelses
were, at a minimum, aware that property owners claimed that they had an easement to use the
"easement area." The deed conveying the 60.003-tract to the Nickelses expressly excepts the Travis
Peak Estate property owners' right to use the "easement area" and Exhibit A to the deed conveying
the 10.279-acre tract to the Nickelses referenced the subdivision plat and the "easement area." See
Holden, 929 S.W.2d at 132 ("An easement by estoppel cannot be extinguished by a successor in title
where the deed referencing a possible easement was recorded."). Mr. Nickels also testified that they
had "asked a lot of people" about who had the right to use the "easement area" and that "[n]obody
seemed to care. So I assumed that there was not much to worry about." See id. (purchasers
acknowledged that were aware of gate before purchased property and, "[w]ithout having inquired
about the use of the gate and the road, [the purchaser] may not now assert that they were unaware
of a claimed right of way over their property"); see, e.g., Thigpen v. Locke, 363 S.W.2d 247, 251
(Tex. 1962) (under Texas law, party in arm's length transaction charged with knowledge of facts that
a reasonable investigation would have revealed). 

 Appellee Robert Ruggiero, who purchased his property in 1982, testified that there
was a sign at the entry gate to the Lakeside Tract that stated "this was a private easement park for
Travis Peak Owners, Joshua English 2." Appellee Charles Anderson, who purchased his property
in 1978, testified that there was a sign at the entry gate at that time that stated "Travis Peak Estate
property owners only" and that the sign disappeared "just about the time--[19]97--Mr. Nickels
showed up." The evidence demonstrates that the Nickelses had actual or constructive notice or
knowledge to bind them to an easement by estoppel at the time that they purchased the 10.279-acre
tract.

 We conclude that the evidence was legally and factually sufficient to support the
district court's findings and that the district court did not err in concluding that appellees have
an easement by estoppel to use the Lakeside Tract as a recreation and private park area. See City
of Keller, 168 S.W.3d at 807; Cain, 709 S.W.2d at 176. We overrule the Nickelses' sixth and
seventh issues.

 Because we conclude that the district court did not err in concluding that appellees
have an express easement or, alternatively, an easement by estoppel, to use the Lakeside Tract, we
need not address the Nickelses' remaining issues as to appellees' alternative legal theories to support
an easement as to the Lakeside Tract. See Tex. R. App. P. 47.1. We turn then to the district court's
finding that appellees have an easement by prescription to the 917-SF area. 


Easement by Prescription 


 As part of their fifth issue, the Nickelses contend that the district court erred when
it found an easement by prescription as to the 917-SF area located on the 60.003-acre tract. The
district court made the following findings of fact as to the 917-SF area:


 29. Travis Peak Estates Property Owners and their predecessor(s) in interest used
the 917 Square Foot Tract as a part of the recreation and private park area for
Travis Peak Estates in a manner that was open, notorious, continuous,
exclusive, and in a hostile and adverse manner for a period of ten years or
more prior to February 18, 2003.


 30. The use of the 917 Square Foot Tract by the Travis Peak Estates Property
Owners and their predecessor(s) in interest as a part of the recreation and
private park area for Travis Peak Estates was of such a nature and character
as to notify the true owner that the Travis Peak Estates Property Owners or
their predecessor(s) in interest were asserting a hostile claim to the land.


 31. There was a distinct and positive assertion of a right to use the 917 Square
Foot Tract as a part of the recreation and private park area that was brought
to the attention of the title owner of the 917 Square Foot Tract and such
assertion was hostile to the owner's rights.


 32. There was privity of estate between each holder [of] this prescriptive
easement right and his successor.

 

 33. The Travis Peak Estates Property Owners and their predecessors in privity of
estate peaceably and adversely possessed the 917 Square Foot Tract as a part
of the recreation and private park area for Travis Peak Estates for more than
ten (10) years prior to February 18, 2003.



The district court also made the following conclusion of law as to the 917-SF area:

 

 16. The Travis Peak Estates Property Owners have acquired an easement by
prescription entitling the Travis Peak Estates Property Owners (and their
invited family members, guests, and invitees accompanied by a Travis Peak
Estates Property Owner), tenants, successors, and assigns to use the 917
Square Foot Tract for recreational and private park use, including accessing
the concrete boat ramp on the Easement Area by automobile and boat trailer.



 A prescriptive easement is acquired by using someone else's land in a manner that
is open, notorious, continuous, exclusive, and adverse for a period of ten years or more. See Brooks
v. Jones, 578 S.W.2d 669, 673 (Tex. 1979); Scott v. Cannon, 959 S.W.2d 712, 721 (Tex.
App.--Austin 1998, pet. denied). The Nickelses challenge the sufficiency of the evidence to support
the elements of exclusive and adverse use, although in their briefing they do not make distinct
arguments as to the 917-SF area as compared with the Lakeside Tract. They contend that there was
no evidence showing that the Nickelses or prior owners were ever excluded. A claim is hostile and
adverse when the adverse possessor's acts performed on the land and use of the land is of such a
nature and character as to reasonably notify the true owner that a hostile claim is being asserted to
the property. Cherokee Water Co. v. Freeman, 145 S.W.3d 809, 817 (Tex. App.--Texarkana 2002,
pet. denied); Mack v. Landry, 22 S.W.3d 524, 531 (Tex. App.--Houston [14th Dist.] 2000, no pet.). 
Independent acts other than continuous use by the user that indicate a separate and exclusive
use satisfy the exclusivity requirement for easements. See Stallman, 9 S.W.3d at 249; Scott,
959 S.W.2d at 722. 

 Appellee Daniel Casburg testified that he remembered using the 917-SF area as a
"turnaround" in conjunction with the boat ramp and for camping and camp fires from 1979 and that
it was part of the area that was leveled when the boat ramp was constructed. (16) Other property owners
testified consistently concerning the property owners' continuous use and maintenance of the 917-SF
area as part of the "easement area" from the purchase of their respective properties. Photographs of
the area and the field notes that Sanders prepared in 2004 were also admitted into evidence, showing
the configuration and use of the turnaround area. (17) This evidence demonstrates that the Nickelses
and their predecessors-in-interest were reasonably notified that a hostile claim was being asserted
to the 917-SF area. (18) See Cherokee Water Co., 145 S.W.3d at 817; Mack, 22 S.W.3d at 531. 

 We conclude that the evidence was legally and factually sufficient to support the
district court's findings as to the 917-SF area and that the district court did not err in concluding
appellees have an easement by prescription to use the 917-SF area as part of the recreation and
private park area. See City of Keller, 168 S.W.3d at 807; Cain, 709 S.W.2d at 176. We overrule the
Nickelses' fifth issue as to the 917-SF area.


Attorney's Fees


 In their eighth issue, the Nickelses contend that, because the district court erred in
declaring that appellees have an easement, the district court abused its discretion in awarding
appellees attorney's fees. See Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 2008) ("[T]he
court may award costs and reasonable and necessary attorney's fees as are equitable and just."). 
Because we have concluded that the district court did not err in its declarations, we conclude that the
district court did not abuse its discretion in awarding appellees attorney's fees. See id.; Bocquet,
972 S.W.2d at 21. We overrule the Nickelses' eighth issue.


CONCLUSION

 

 Having determined that the district court did not err in concluding that appellees have
an express easement or, alternatively, an easement by estoppel to use the Lakeside Tract as a
recreation and private park area and an easement by prescription to use the 917-SF area as part of
the recreation and private park area, we affirm the judgment of the district court. 




 __________________________________________


 Jan P. Patterson, Justice


Before Justices Patterson, Pemberton and Waldrop


Affirmed

 

Filed: June 18, 2009








1. Craig and Sheila Nickels brought suit initially against James Casburg; James W. Casburg,
Sr.; Joe F. McNair; Charles Anderson; Daniel W. and Tammy R. Casburg; Mamie L. Hollan; Vernon
L. Crane; Kent A. and Kerin Schooler; Marvin and Carol Ivey Moring; Richard G. and Eileen
Washington; Richard and Madelyn Naber; Graciela Pena; Paula and Aaron Neujahr; Ayron Brooks;
Robert W. and Sally B. Ruggiero; David and Freda Mathews; and David Mathews II. Linda McNair;
Fred Nelson; Marie Claymore; Flat Creek Limited; Kent Alden Schooler and Kerin Jo Schooler,
Trustees of Schooler Living Trust; Patricia Sue Maloney; Rory A. McLaughlin; Sallie McLaughlin;
Robert W. Ruggiero and George Ruggiero, individually and as authorized agents of the Texas
Veterans Land Board; and Tina Broderick intervened in the action. Appellees have informed this
Court that Carol Moring died during the pendency of the suit and her estate passed to her husband,
Marvin Moring, and that Tammy R. Casburg, Paula Neujahr, and Aaron Neujahr were dismissed
from the suit before the final judgment.
2. The subdivision plat also reflects that the Roadway Easement is "FOR USE OF TRAVIS
PEAK ESTATES OWNERS."
3. At the time of trial, the original tracts that P&W Co. sold had been further subdivided.
4. Mr. Nickels testified at trial that the same principals were involved in Westlake and
Peninsula. 
5. The copy of the drawing is not entirely legible, but the Nickelses do not dispute that the
drawing contains a description of the Lakeside Tract as the "EASEMENT AREA FOR USE OF
TRAVIS PEAK ESTATES OWNERS." 
6. Stuart Watson, the son of James Watson, prepared and signed this document. The two
Watsons worked together in their business Watson Surveying. We refer to James Watson as
"Watson" or "James Watson."
7. During the pendency of the suit, the Nickelses obtained a temporary injunction against
appellee David Mathews II. The district court ultimately denied the Nickelses' claims for monetary
damages, and the Nickelses do not challenge the denial of these claims on appeal.
8. Mr. Nickels testified first, and Mrs. Nickels adopted his testimony as her own. 
9. Mr. Nickels testified that "Peninsula principals" proposed to "swap ten acres for the 30-foot
easement" and that there were not any additional negotiations as to the terms beyond the location of
the easement on the 60.003-acre tract:


 Q. Okay. But in any event, there wasn't any give and take between Westlake,
beyond their first offer to you, which was to trade the fee simple for the
easement?

 

 A. None. I mean we talked about where we were going to put the easement.


 During cross-examination, Mr. Nickels testified further:


 Q. [The Lakeside Tract] looks nice to me. It looks very inviting. Did you--did
the thought ever go through your mind, why would someone give this up?


 A. Why would they? No.


 Q. For no money. No money changed hands. Did it ever--did a warning light
ever go off for you, why am I getting this for no money?


 A. No.
10. A recital in the Reciprocal Easement, Conveyance, and Escrow Agreement was consistent
with Mr. Nickels's testimony as to the reasons for agreeing to the 10.279-acre transaction:


 WHEREAS, Nickels wishes to secure title to a fifty foot (50) portion of a certain
tract of land adjacent to the Nickels Property owned by Peninsula (the "Peninsula
Property") which would provide Nickels with access to Lake Travis, and Peninsula
wishes to secure an easement for ingress and egress along and through the Nickels
Property.
11. Watson testified that there was "quite a bit of bulldozing work to do in that cove [the
'easement area']. It was a pretty steep type cove. And it was bulldozed so that a boat ramp could
be built there." 
12. The final judgment defines the "Travis Peak Estates Property Owners" to mean:


 the following defendants and intervenors owning property in Travis Peak Estates:
Defendants and Intervenors James Casburg; Joe F. McNair; Charles Anderson;
Daniel W. Casburg; Mamie L. Hollan; Vernon L. Crane; Marvin Moring; Carol
Moring; Richard G. Washington; Eileen Washington; Ayron Brooks; and Robert W.
Ruggiero; and Intervenors Linda McNair; Fred Nelson; Marie Claymore; Flat Creek
Limited, owned by Richard Naber and Madelyn Naber; Kent Alden Schooler and
Kerin Jo Schooler, Trustees and beneficiaries of the Schooler Living Trust; Patricia
Sue Maloney; Rory A. McLaughlin; Sallie McLaughlin; and Robert W. Ruggiero,
Individually and as authorized agent of the Texas Veterans Land Board; George
Ruggiero, Individually and as authorized agent of the Texas Veterans Land Board;
Tina Broderick; and Freda Annette Dufour f/k/a Freda Dufour Mathews (also known
as Freda Annette Mathews). 
13. On appeal, the Nickelses do not challenge appellees' right to use the Roadway Easement.
14. The district court defined the "Easement Area" differently in the final judgment and in its
findings of fact and conclusions of law. In its findings of fact and conclusions of law, the district
court defined the "Easement Area" to mean only "that tract of land described as Easement Area on
the James T. Watson field notes recorded in Volume 2566, Page 225."
15. To support that they have an express easement, appellees also rely on the two deeds to
original purchasers that reference the "easement area" as recorded in Vol. 2566, Page 225, and state
"[b]y way of clarification" that there "has been erected a boat loading ramp" and that the "easement
area" for "use of a recreation and/or private park" is "permanent" and "for the use of Grantee herein,
her heirs and assigns in common with Grantor herein, its successors and assigns." Because the
10.279-acre tract was part of the last tract conveyed to an original purchaser, these two deeds are in
the Nickelses' chain of title and are consistent with the district court's finding that appellees have
an express easement. 

 The deed conveying the 60.003-acre tract also is consistent with appellees' express
easement to use the Lakeside Tract as a recreation and private park area. The deed conveyed the
"EASEMENT ESTATE" as "Tract 2," and the Nickelses' title was expressly subject to the "rights
of the Owners in Travis Peak Estates for the use of the easement area described on the plat contained
with the [recorded option contract]." The plat contained with the option contract is a drawing
depicting the Lakeside Tract as the "EASEMENT AREA FOR USE OF TRAVIS PEAK ESTATES
OWNERS." Mr. Nickels testified that the purchase of the 10.279-acre tract was contingent on
purchasing the 60.003-acre tract and that the two tracts were "[p]art and parcel of the same thing." 
See Vinson v. Brown, 80 S.W.3d 221, 231 (Tex. App.--Austin 2002, no pet.) ("The general rule for
construing separate instruments or contracts together is that those executed at the same time, for the
same purpose and in the course of the same transaction may be considered as one instrument, and
may be read and construed together.").
16. Casburg testified:


 Q. Are you familiar with the area that's depicted as the turnaround area?

 

 A. Yes, sir.


* * *


 Q. From your personal knowledge, how long do you remember that area being
used as a turnaround area?

 

 A. From day one that I went there when I was ten years old.

 

 Q. And have you used that area for turning your boat around?

 

 A. Every time, until it was fenced.

 

 Q. Is that turnaround area, in your opinion, necessary to access the boat launch?


 A. It is not totally necessary, but it is very helpful. I put my boat in there two
weeks ago. And I have a pretty good size ski boat. And without being able
to use that recreation--I mean, that turnaround area and having to turn around
on the upper one is about 100, maybe 150 yards of very narrow road that I
had to turn around up there and back all the way down to that. And if you've
got any decent size boat, it's difficult. It's--you know, it's real--it's not near
as easy as being able to pull down and turn around around the tree and back
by the ramp, the way it was meant to do. All that was--also, when they built
the ramp, both sides of that was excavated out so that there was a level area
there to use as a turn around. You can see where both banks had been cut out
with a bulldozer that they did the ground work with.
17. When asked if the 917-SF area would allow "turnaround automotive traffic," Sanders
testified that the area would be "reasonably sufficient. It's small. It's tight."
18. For example, appellee Anderson testified that the 917-SF area was "used to turn around
your trailer and then back into the boat ramp . . . for years and years as a turnaround," and he used
the boat ramp "four or five times a week" from 1978 but that he could not use it anymore "[b]ecause
I can't turn my boat around in there."